# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT KNOXVILLE

### JULY SESSION, 1997

FILED

January 14, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| BILLY RAY IRICK, | ) | C.C.A. NO. 03C01-9608-CR-00304 |
| | ) | |
| Appellant, | ) | |
| | ) | KNOX COUNTY |
| | ) | |
| V. | ) | |
| | ) | HON. RAY L. JENKINS, JUDGE |
| STATE OF TENNESSEE, | ) | |
| | ) | (POST-CONVICTION |
| Appellee. | ) | (DEATH PENALTY) |


FOR THE APPELLANT:

**DOUGLAS A. TRANT**
900 South Gay Street
Ste. 1502, Riverview Tower
Knoxville, TN 37902

**T. HAROLD PINKLEY**
CHIMBLISS & BAHNER
1000 Tallan Building
Two Union Square
Chattanooga, TN 37402

FOR THE APPELLEE:

**JOHN KNOX WALKUP**
Attorney General & Reporter

**AMY L. TARKINGTON**
Assistant Attorney General
2nd Floor, Cordell Hull Building
425 Fifth Avenue North
Nashville, TN 37243-0943

**RANDALL EUGENE NICHOLS**
District Attorney General

**ROBERT L. JOLLEY, JR.**
Assistant District Attorney General
400 Main Street
P.O. Box 1468
Knoxville, TN 37901


OPINION FILED _____

AFFIRMED

THOMAS T. WOODALL, JUDGE

# OPINION

The Petitioner, Billy Ray Irick, appeals as of right pursuant to Rule 3 of the Tennessee Rules of Appellate Procedure from the denial of his petition for post-conviction relief by the Knox County Criminal Court. He argues that he received the ineffective assistance of counsel, that the state's violation of its duty under Brady v. Maryland warrants a new trial, and that his sentence of death must be put aside because the four aggravating circumstances found by the jury were invalid.

After a thorough review of the record, including the trial transcript and the evidentiary hearing on the post-conviction petition, we are of the opinion that the Petitioner received the effective assistance of counsel; that the Petitioner failed to prove a Brady violation;   and that the only invalid aggravating factor, the felony-murder aggravating circumstance, was harmless beyond a reasonable doubt.  The trial court's denial of the Petitioner's petition is therefore affirmed.

## PROCEDURAL HISTORY

The Petitioner was convicted in 1987 of felony murder and two counts of aggravated rape.  He was sentenced to death by electrocution for the felony murder conviction and to forty (40) years as a Range II especially aggravated offender on each charge of aggravated rape, to be served concurrently with each other and consecutively to the death sentence. Specifically, in imposing the death penalty, the jury found the presence of the following four aggravating circumstances: (1) The victim was less than twelve

(12) years of age and the defendant was eighteen (18) years of age or older; (2) the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind; (3) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant; and (4) the murder was committed while the defendant was engaged in committing the felony of rape. T.C.A. § 39-2-203 (i)(1), (5), (6) and (7).

The Tennessee Supreme Court affirmed the Petitioner's convictions and sentences on direct appeal. State v. Irick, 762 S.W.2d 121 (Tenn. 1988), cert. denied, 489 U.S. 102, 109 S. Ct. 1357, 103 L. Ed. 2d 825 (1989). The Supreme Court's opinion provides the following synopsis of the evidence presented at trial:

> In summary, the State's proof was that Billy Ray Irick was a friend of the child's mother and step-father. He had lived with them for a time, often caring for the five (5) young children in the family while the Jeffers were working. At the time of the incident the Jeffers were separated. Mr. Jeffers and the defendant were living with Jeffers' mother. On the night of the occurrence Mrs. Jeffers left defendant with the children when she went to work. She was somewhat uneasy about this because defendant had been drinking, although he did not seem to be intoxicated. He was in a bad mood because he had been in an argument with Mr. Jeffers' mother earlier in the day. He did not want to keep the children since he planned to leave Knoxville for Virginia that night. Mrs. Jeffers called her husband at the truck stop where he worked to tell him of her fears. He reassured her and said he would check on the children.
>
> About midnight Mr. Jeffers received a telephone call from Irick telling him to come home, suggesting there was something wrong with the little girl, saying, "I can't wake her up." When Jeffers arrived at the house defendant was waiting at the door. The child was lying on the living room floor with blood between her legs. After ascertaining she still had a pulse, Jeffers wrapped her in a blanket and took her to Children's Hospital.

> Efforts to resuscitate her there failed and she was pronounced dead a short time later.
>
> Physical examinations of her body at the hospital emergency room and during the autopsy were indicative of asphyxiation or suffocation. The cause of death was cardiopulmonary arrest from inadequate oxygen to the heart. There was an abrasion to her nose near one eye and lesions on her right chin consistent with teeth or fingernail marks. Blood was oozing from her vagina, which had suffered an extreme tear extending into the pelvic region. There were less severe lacerations around the opening of her rectum in which semen and pubic hair were found. These injuries were consistent with penetration of the vagina and anus by a penis.

Irick, 762 S.W.2d at 133-34.

The Petitioner filed his petition for post-conviction relief on May 5, 1989. After counsel was appointed to represent the Petitioner, the petition was amended on numerous occasions. The hearing on the petition was held in the trial court on November 30, 1995, December 1, 1995, and December 14, 1995. The trial court dismissed the petition on April 1, 1996, issuing a statement of its finding of facts and conclusions of law.

The trial court found: (1) that the Petitioner was afforded the effective assistance of counsel; (2) that no Brady violations were proven and nothing was introduced to show the alleged violations were material to his punishment; (3) that the sentence was not a violation of the Double Jeopardy clause; (4) that the claims concerning the flight instruction and appearance before a Magistrate were waived because there was no objection at trial or on direct appeal; (5) that the "heinous, atrocious or cruel" aggravating circumstance is constitutional; (6) that Tennessee's death penalty is not cruel and unusual punishment; (7) that the court's failure to allow polygraph evidence was not a violation of due process; and

(8) that the Middlebrooks error was harmless.  The Petitioner timely filed his notice of appeal.

## POST-CONVICTION EVIDENTIARY HEARING

At the post-conviction evidentiary hearing, Jimmy Ray Morris, a polygraph examiner, was allowed to testify for the Petitioner as an offer of proof. He stated that he was asked by Detective Wiser to perform a polygraph examination on Kenneth Jeffers, the victim's stepfather, on April 16, 1985.  The examination was conducted and Mr. Jeffers was asked two questions concerning whether he had done anything physically to the victim to cause her death.  Mr. Jeffers responded that he had not, and Mr. Morris stated that his conclusion had been that Mr. Jeffers was not telling the truth.  A copy of Mr. Morris's report was introduced into evidence.

On cross-examination, Mr. Morris stated that he did not recall at what time of the day the exam had been given but that it had been given the day after the victim was murdered.  He admitted that he did not know whether Mr. Jeffers might have given a poor response because of the guilt he was experiencing for leaving his stepdaughter with the Petitioner.

Donald Wiser, a detective with the Knoxville Police Department in April 1985, testified that he had requested that a polygraph test be conducted on Mr. Jeffers because Wiser had information that when Mr. Jeffers had lived in Clinton, Tennessee, he had been under investigation for abusing his natural children.  When questioned concerning whether there had been any problem

-5-

when Detective Wiser took the Petitioner's statement, the state objected on the ground that the issue of the admissibility of the statement had been raised and refuted on direct appeal. However, as an offer of proof, Wiser testified that when he had taken the statement, he, himself, had been very tired and the Petitioner had been very emotional. He admitted that he had been under pressure to complete the investigation in this case and that he wished he had gone back to the area where the Petitioner alleged he had spent the night after the murder. Detective Wiser identified photographs of the victim's "very unkempt, nasty" residence, taken on the night of the incident, and the photographs were introduced into evidence. Wiser then testified concerning a conversation he had with Robert Holt, the F.B.I. serologist, in which Mr. Holt had stated that he could not offer a definite opinion concerning blood evidence.

The Petitioner, Billy Ray Irick, testified that he had not raped and killed the victim. He stated that he had been incarcerated a week prior to being taken before a magistrate. He testified that what he had said in his statement was not the truth because he had felt there were only two ways he was going to come out of the room in which he was being questioned, "either I tell them what I [sic] wanted or I was going to be coming out feet first." He stated that he had been told by his initial attorneys that if he had a preliminary hearing, the court could find him guilty and send him to the electric chair, and because of that advice, he waived his right to a preliminary hearing.

The Petitioner testified that new counsel had been appointed and that these attorneys had suggested that he utilize an insanity defense, but that when he refused to "go along with them," they would not talk with him. He stated

-6-

that he had met with counsel only three or four times prior to trial and that he had mentioned that he wanted a DNA analysis but that his attorneys had treated him like he did not know what he was talking about. He also testified that his attorneys had suggested that he not testify at trial even though it was his desire to do so. Mr. Irick claimed that his attorneys had never questioned him concerning any head injuries he had previously experienced and that he had never been asked about blood or hair testing.

On cross-examination, the Petitioner was questioned as to how his pubic hair had been found in the victim's rectum, and he replied that he did not know that the hair was his. He admitted that no one had specifically threatened him during questioning, but because of the actions of the police, he had been frightened. He admitted that he had never told his attorneys that he had lied to the police but stated that when his attorneys had shown him his statement in which he had admitted killing the victim, he had told them that he had not committed the crime. He testified that he was not sure why he had run away on the night of the murder.

In describing his recollection of the events occurring on the day of the murder, the Petitioner stated that when he had arrived at the victim's house, he had gone "out back" to drink beer and had smoked marijuana with a friend. He testified that Ms. Jeffers went to work, Mr. Jeffers left shortly thereafter, and he remained at the house alone with the Jeffers' children. He put the children to bed and laid on the couch to watch television. Sometime during the evening, the victim came to the living room and told him that she was sick. The Petitioner

told her to "go back and lay down in daddy's bedroom" because that would be the first place where Ms. Jeffers would find her.

Later, the Petitioner observed that the dog had come in. He stated that he had wondered how the dog had gotten in and that he had gone to the back door, noticing that something was not right because the back door was "wide open." He shut the back door and when he passed beside the room in which the victim was lying down, he stated that he observed the victim was not breathing because she always snored. He then called Mr. Jeffers and attempted to conduct CPR on the victim.

When questioned as to how blood had gotten inside the crotch of his pants, the Petitioner stated that it may have gotten there when he picked the victim up from the bed. He testified that he left when Mr. Jeffers arrived because he was scared. When questioned as to why he had told his attorneys that he did not remember what had happened on the night of the murder, he stated that he could not remember everything but did remember telling his attorneys that he did not commit the crime. When questioned as to why he told police in his statement that "when I lost it, it was when I raped her," he answered only that he did not rape the victim. He admitted that in his statement he had told Officer Wiser that he had not been threatened or coerced into making the statement.

Pamela Mary Auble, a clinical neuropsychologist, testified that she was asked to evaluate the Petitioner to determine the possibility that he suffered from some type of brain damage and to determine his personality structure. She stated that either she or others working under her supervision had spent twenty-

one (21) hours with the Petitioner and had examined records from Home for Children, the Mental Health Center, Knoxville Orthopedic Clinic, Lakeshore Psychiatric Hospital, the Army, and the Petitioner's GED. She also obtained and examined records from West Knoxville Neurological Associates, Dr. Diana McCoy, Fort Sanders Regional Medical Center, and the Helen Ross McNabb Center. She stated that she had relied upon these records and her evaluation of the Petitioner in making her conclusions. The state objected to the relevance of her testimony since her evaluation was conducted after the Petitioner had been convicted of the crime. The objection was sustained, but as an offer of proof, she stated that from the earlier records she had reviewed, the possibility of brain damage had been raised in an evaluation conducted by the Mental Health Center when the Petitioner was six years old. The possibility was raised again when the Petitioner was hospitalized at Lakeshore Psychiatric Hospital when the Petitioner was eight years old. The Petitioner's diagnosis at that time was chronic brain syndrome of unknown or unspecified origin with behavioral reaction.

Dr. Auble testified concerning the Petitioner's mother's difficult pregnancy with the Petitioner and the fact that the Petitioner had been a "blue baby." As a child, reports showed that the Petitioner was passive and unresponsive, a pattern indicative of brain damage. Ms. Auble testified that from the test results obtained from the Petitioner, he had particular difficulty with tasks which required him to modulate his behavior and to regulate his actions. She stated that he acts impulsively and without regard for the consequences and has major difficulties with relationships.

In response to questioning concerning the Petitioner's mental health, Dr. Auble testified that he had suffered emotional damage as a child. When he was three years old, he began exhibiting behavioral hyperactivity and told others that his mother tied him up and abused him. At the age of six, he began a lifetime of outpatient psychological treatment. He was hospitalized for a year at Lakeshore Hospital when he was eight years old, and from there, he was sent to a children's home in Sevierville, Tennessee. During the next five years, his parents were not involved in his treatment, and when he was sent home for summer vacation in 1972, he reportedly chopped the television set with an ax, clubbed flowers in the flower bed, cut up his sister's pajamas, and set fires to wastebaskets. In July he was returned to the children's home, where he broke a window and climbed into a young girl's bedroom. He was chased away, but a knife was later found in the bed. He was then readmitted to Lakeshore Psychiatric Hospital where he was given Thorazine, a major tranquilizer.

Dr. Auble's test results also indicated that the Petitioner has no empathy with other people, that he does not know how to form relationships, and that he does not know how to show anger in a modulated way. His intellectual functioning was in the low average range.

Dr. Auble concluded that based upon the Petitioner's history and current evaluation, he suffers from a serious mixed personality disorder and that brain damage could not be ruled out. She also stated that the Petitioner's statement to the police would be consistent with his mental condition in that he would be responsive to people structuring the situation for him in asking yes-no questions and would answer accordingly. She testified that the Petitioner's flight

after the death of the victim was consistent with his behavioral pattern of leaving the situation in times of stress.

Dr. Auble testified that in reviewing the Petitioner's jail records, of significance were two instances whereby the Petitioner attempted suicide. On one occasion he cut his wrists with a steel shank and on the other he was observed beating his head on the floor. The jail records were introduced into evidence.

Dr. Auble also reviewed the Petitioner's medical records from the Prison Health Services and concluded that other than the suicide attempts, he had adjusted well to prison life. A psychiatrist and a psychologist had seen him, and they had not seen the need to force him to have treatment. These records were made exhibits. Finally, Dr. Auble reviewed materials provided to her by Dr. McCoy. The materials consisted of two pretrial drawings and writings of the Petitioner on why he hates people and his war on life. These were also introduced into evidence.

On cross-examination, Dr. Auble admitted that the Petitioner had once obtained an IQ test score of 107. She admitted that the file she had reviewed contained a letter stating that the records had been made available to the Petitioner's original trial counsel on November 18, 1985. Counsel was also allowed access to records concerning the Petitioner's past social history, especially those in which the Petitioner had behaved inappropriately. Dr. Auble admitted that the Petitioner had denied that he had ever been hospitalized or had ever suffered from depression or any mental condition when he had enlisted

in the United States Army. Dr. Auble also acknowledged that included in the file she had reviewed was an emergency room summary by a Dr. Turner who had examined the Petitioner on April 16, 1985, the day following the murder of the victim, and had found some dark spots on the Petitioner's scrotum. The doctor had concluded that he could not determine whether the spots were blood or stool. Dr. Auble also admitted that the file contained a neuropsychological evaluation conducted by Emily Oglesby prior to trial in which Dr. Oglesby concluded that she could not rely on the test results because the Petitioner had cooperated poorly and had demonstrated loud and insistent behavior.

The state referred Dr. Auble to numerous instances in records from the Helen Ross McNabb Center in which the Petitioner had mocked the deceased's family, had described himself as dangerous, and had admitted that he had been enraged at the stepfather of the victim for making him babysit on the evening of the murder. The state also noted reports from Dr. Tennyson and Dr. Dye which found the Petitioner antisocial, schizoid, narcissistic, and histrionic and concluded that his forgetfulness was not supported by indications of any linked psychopathology or neurological illness.

Dr. Auble admitted that the Petitioner's score on the "fake scale" of the Minnesota Multiphasic Personality Inventory had been high enough to be significant. It was her opinion a high score on this scale indicated the possibility that the Petitioner had been exaggerating or that he was seriously emotionally disturbed. She concluded that based upon other test results and the Petitioner's history, serious emotional disturbance was the cause of this high factor.

-12-

Dr. Auble also admitted that the records reflected that based upon tests completed in January 1967, a prior diagnosis of chronic brain syndrome had been changed to situational reaction of childhood at Lakeshore Psychiatric Hospital. Dr. Auble stated, however, that when she was completing her report on the Petitioner she had reviewed all of the Petitioner's records and had reached the conclusion that he possibly suffered from organic brain dysfunction. The Petitioner then declared that he had concluded his proof.

The state called as its first witness Randy Reagan, initial counsel for the Petitioner. Mr. Reagan testified that he had been appointed to represent the Petitioner at his preliminary hearing in 1985 but that the preliminary hearing had been waived because of a concern over pretrial publicity. He also testified that because the preliminary hearing was waived, defense counsel was allowed to review photographs that were taken and was supplied with the witness statements. He recalled talking to the Petitioner concerning the preliminary hearing and testified that his practice at that time would have been to discuss the pros and cons of the hearing with the Petitioner to make sure the Petitioner understood why a defendant would have a preliminary hearing and why a defendant would waive a preliminary hearing. When questioned as to whether he threatened the Petitioner by telling him that he would go to the electric chair if he had a preliminary hearing, Mr. Reagan stated that he definitely would not have threatened the Petitioner in that manner.

On cross-examination, Mr. Reagan was shown numerous exhibits including a list of questions purportedly sent to the prosecutor from the victim's mother which impliedly implicated the victim's stepfather. He was also shown

several DHS reports concerning abuse of the stepfather's natural children by the stepfather. Mr. Reagan stated that he did not see these documents prior to the preliminary hearing, and that they would have been important to rebut the state's proof of probable cause that the Petitioner was the person who committed the crime.

On redirect, Mr. Reagan was shown the statement of the Petitioner in which he admitted raping and choking the victim. However, Mr. Reagan testified that the Petitioner had told him that he had been coerced into making the statement. It was Mr. Reagan's opinion that if he had had the DHS information, he would have been "on stronger ground" in making a motion to suppress the Petitioner's statement.

Ken Miller, trial counsel for the Petitioner, testified that he and co-counsel Jim Varner had been appointed to represent the Petitioner in Criminal Court in 1985. He testified that he had spoken with the Petitioner on many occasions and that he would have discussed with him whether he should testify at the suppression hearing and at trial. He recollected that the Petitioner was not anxious to testify and that the more counsel talked to him, the more counsel realized that the Petitioner would not make a good witness. He recalled that the Petitioner's memory of events surrounding the victim's death changed from time to time. He did not recall any specific request of the Petitioner as to what he wanted done with the case and did not remember the Petitioner asking for a DNA test. He stated that he had discussed a mental related defense with the Petitioner and that the Petitioner had been evaluated at Ridgecrest Psychiatric Hospital and examined by Diana McCoy. A neuropsychological evaluation had

been obtained, and the resulting proof had been presented at trial through Nina Braswell Lunn, a social worker. Counsel testified that a strategic decision not to call Dr. McCoy or the psychiatrist had been made because they had referred to the Petitioner as a sociopath.

On cross-examination, Mr. Miller testified that he had been aware that the victim's stepfather had failed a polygraph test but stated that he had never seen the list of questions purportedly from the victim's mother or any of the DHS records. He stated that the allegations of the victim's mother would have been important for impeachment purposes and in the sentencing phase of the trial. He testified that the DHS records would have been extremely important in both the guilt and sentencing phases.

DHS records presented to Mr. Miller during the hearing included (1) an order from the Juvenile Court for Knox County finding that the children of Mr. Jeffers had been subjected to "severe child abuse" caused by "continual excessive discipline," (2) complaints received by DHS concerning physical abuse of Mr. Jeffers' children, (3) a foster care plan which required that Mr. Jeffers and his wife attend counseling dealing with parenting skills and pay support while the children were placed in foster care, and (4) a redetermination of eligibility for Title XX services which stated that Mr. Jeffers had not obtained parenting counseling. The records also included a letter to Juvenile Court Judge Wagner from social workers who had conducted a surprise visit to the Jeffers home and reported that the Petitioner lived in the home and provided child care and that he had been observed taking good care of the children. Another DHS report stated that the DHS supervisor had gone to the home and talked with the children, asking them

about the Petitioner. The girls in the family told the supervisor that they liked "Uncle Bill" and that he had never hurt them or tried to do anything else such as "touch[ing] them in their panties."

Mr. Miller testified that if he had been given these documents, he would have contacted the social workers who interviewed the children and conducted the home visit as possible witnesses to show that the Petitioner loved and cared for the children. He also stated that the information would have been extremely important to cast doubt as to who committed the crime.

On redirect, Mr. Miller stated that he had investigated whether another person committed the offense, but the effort had been unsuccessful in that the only information they had obtained had been the polygraph test which Mr. Jeffers failed and which was inadmissible. Mr. Miller admitted that he did not investigate whether or not Mr. Jeffers was where he said he was on the night of the murder.

James H. Varner, Jr., co-counsel for the Petitioner, testified that he had assisted Mr. Miller in representing the Petitioner. He stated that he had had several conversations with the Petitioner and recalled that the decision had been made that the Petitioner not testify because he could not remember what happened on the evening of the murder. He stated that if the Petitioner had insisted on testifying, he would have been allowed to do so.

On cross-examination, Mr. Varner was shown the same DHS documents and letter that had been shown to Mr. Miller. He too stated that he

had not been given these documents and felt that they would have been important to impeach Ms. Jeffers and to attack the credibility and character of the only other suspect in the case, Mr. Jeffers. He stated that the overall trial strategy would have changed because attacking the parents of a child who had been murdered without something substantial to place in front of a jury would be something an attorney should not do. However, with the substantial allegations of child abuse over a period of time, counsel could have cast Mr. and Ms. Jeffers in a different light. He stated that he would not have backed off some of the questions that he had wanted to ask Mr. and Ms. Jeffers. Mr. Varner also stated that the records would have been beneficial to bolster the Petitioner's claim that he had no reason to commit this offense and that he had always cared for the children appropriately.

Mr. Varner testified that he had made an effort to determine whether Mr. Jeffers' alibi had checked out. He stated that there had been a period of time when Mr. Jeffers had supposedly been at work that could not be verified. He admitted that at the original trial an FBI expert testified that hair found on the victim was consistent with that of the Petitioner, but he could not recall whether a hair analysis was done on Mr. Jeffers.

On redirect, Mr. Varner stated that he had hired Cleveland Blake, a certified forensic pathologist, to testify concerning the strength of the state's analysis of the serological evidence. However, on the day Dr. Blake was to testify, he purportedly started "waffling" as to his prior conclusions, and counsel decided not to present him as a witness. Mr. Varner stated that there was nothing in the FBI report concerning the hair analysis to indicate that Mr. Jeffers'

-17-

hair was tested for the purpose of comparison to the hair that was found inside the victim.

The final witness for the state, David Jennings, the assistant district attorney who assisted in the prosecution of the Petitioner, testified that in his contacts with Mr. and Ms. Jeffers, pretrial and during the trial, Ms. Jeffers had appeared to be grief stricken and Mr. Jeffers had acted like a grieving stepfather. He stated that he had no recollection of seeing the letter purportedly written by Ms. Jeffers, but that he recalled that Ms. Jeffers would go into "ramblings" with him during their interviews and sometimes ask questions similar to those in the letter. With this testimony, the state concluded its proof.

In reviewing the trial court's determinations, we are guided by certain rules. Since this petition was filed prior to the effective date of the Post Conviction Act of 1995, the burden was on the Petitioner at the hearing to prove his case by a preponderance of the evidence. On appeal, the trial court's findings are conclusive unless the evidence preponderates against its determinations. Turner v. State, 698 S.W.2d 90, 91 (Tenn. 1985). The burden now rests upon the Petitioner to illustrate how the record preponderates against the judgment. Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990).

## I. EFFECTIVE ASSISTANCE OF COUNSEL

The Petitioner contends that his attorneys were ineffective for failing to object to the trial court's failure to instruct the jury that it is the sole judge of not only the facts but also the law, for failing to follow through in attempting to

introduce evidence that Kenneth Jeffers failed a polygraph test concerning the incident, for failing to raise the issue of double jeopardy concerning convictions for felony murder and aggravated rape, for failing to object to a jury instruction that evidence of flight may justify an inference of guilt, and for failing to raise an issue concerning the fact that he was not taken before a magistrate until a week after his arrest. We hold that the Petitioner received the effective assistance of counsel.

In determining whether counsel provided effective assistance at trial, this court must decide whether counsel's performance fell within the range of competence demanded of attorneys in criminal cases. Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To succeed on a claim that his counsel was ineffective at trial, a Petitioner bears the burden of showing that his counsel made errors so serious that he was not functioning as counsel as guaranteed under the Sixth Amendment and that the deficient representation prejudiced the Petitioner, resulting in a failure to produce a reliable result. Strickland v. Washington, 466 U.S. 668, 687, reh'g denied, 467 U.S. 1267 (1984); Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993); Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990). To satisfy the second prong, the Petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding Petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine the confidence in the outcome." Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994).

When reviewing trial counsel's actions, this court should not use the benefit of hindsight to second-guess trial strategy and criticize counsel's tactics.

Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1992). Counsel's alleged errors should be judged at the time they were made in light of all the facts and circumstances. Strickland, 466 U.S. at 690; see Cooper, 849 S.W.2d at 746.

The Petitioner first claims that counsel was ineffective for failing to object to the trial court's failure to instruct the jury that it was the sole judge of not only the facts but also the law. The state asserts that no Tennessee appellate court has ever held that a defendant has a right to have a jury instructed that it may ignore the mandates of the law set out by the trial court's instructions.

In Judge v. State, 539 S.W.2d 340, 342-43 (Tenn. Crim. App. 1976), the defendant alleged that the court erred in instructing the jury that it was the judge of fact and in reaching its verdict, it was to consider the law in connection to the facts but that the court was the proper source from which it was to get the law. As in the case at bar, the defendant insisted that the instruction violated Article 1, Section 19 of the Tennessee Constitution which states that, "[t]he jury shall have the right to determine the law and facts under the direction of the court in libel as in other criminal cases."

This court concluded that it was unnecessary to decide the issue because the error in the charge, if any, was harmless error. Id. at 343. This court cited the following standard as set out in Ford v. State, 101 Tenn. 454, 47 S.W. 703 (1898), in rejecting the defendant's claim:

> . . .[The] mere failure to tell the jury that they are the
> judges of the law is not necessarily reversible error. . . .
> [W]here no injury could have resulted to defendant, it
> is not reversible error. Such a case is one where,

> whoever judged of the law, it was sufficiently and
> accurately charged, and as fully as should have been.

Judge, 539 S.W.2d at 343.

In this case, the record reflects that the jury was sufficiently and accurately charged as to the applicable law, and we cannot conclude that the Petitioner was prejudiced by this omission. Accordingly, even if Petitioner's counsel should have objected to the charge as given, the error does not rise to the level of ineffective assistance of counsel.

The Petitioner next claims that counsel was ineffective for failing to follow through in attempting to introduce evidence that Kenneth Jeffers, stepfather of the victim, had failed a polygraph test concerning his involvement in the murder of the victim. The Petitioner asserts that counsel failed to follow through in its attempt to introduce the evidence at the guilt phase and, moreover, failed to attempt to introduce the evidence at the penalty phase where it would clearly have been admissible. We do not agree.

It has long been established in Tennessee that the results of a polygraph examination are not admissible as evidence in a criminal prosecution. State v. Campbell, 904 S.W.2d 608, 614 (Tenn. Crim. App. 1995); Grant v. State, 213 Tenn. 440, 443 374 S.W.2d 391, 392 (1964); Marable v. State, 203 Tenn. 440, 456, 313 S.W.2d 451, 458 (1958); State v. Adkins, 710 S.W.2d 525, 529 (Tenn. Crim. App. 1985); State v. Elliott, 703 S.W.2d 171, 177-78 (Tenn. Crim. App. 1985). The courts of this state have consistently held that the results of such tests are "inherently unreliable." Adkins, 710 S.W.2d at 529.

The Petitioner argues that the aforementioned evidence would "clearly" have been admissible at the penalty phase of the proceedings. However, Tennessee Code Annotated section 39-2-203(c), now codified at section 39-13-204(c) (1996 Supp.), simply provides that the following evidence may be presented at the penalty phase:

> . . . evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and any evidence tending to establish or rebut any mitigating factors. Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence; provided, that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted.

The admissibility of the evidence of which the Petitioner complains does not fit under any of these categories. The results of a polygraph test would have no probative value on the issue of punishment. Accordingly, again, we must conclude that the Petitioner's claim is without merit.

The Petitioner contends that trial counsel was ineffective for failing to raise the issue that his convictions for both felony murder and the underlying aggravated rapes are a violation of the double jeopardy clause of the Fifth Amendment of the United States Constitution and thereby violate the Petitioner's due process rights. The Petitioner cites the United States Supreme Court decision in Whalen v. United States, 445 U.S. 684, 100 S. Ct. 1432, 63 L. Ed. 2d 715 (1980) in support of this proposition. He also cites Briggs v. State, 573

S.W.2d 157 (Tenn. 1978), in which our supreme court held that convictions for felony murder and the underlying felony of armed robbery could not stand. The Petitioner faults counsel for failing to raise this issue.

The state concedes that Briggs does support the Petitioner's argument, but correctly asserts that Briggs is no longer controlling law. 573 S.W.2d 157. In State v. Blackburn, 694 S.W.2d 934 (Tenn. 1985), our supreme court revisited Briggs and reversed the underlying appellate court's dismissal of the defendant's conviction for assault with intent to commit rape. The intermediate appellate court concluded that the assault conviction merged with the felony murder conviction. However, the Supreme Court concluded that the legislature intended that multiple punishments be imposed on convictions of a defendant for felony murder and the underlying felony. Id. at 937.

Since Blackburn, Tennessee courts have consistently rejected a double jeopardy claim on convictions for felony murders and the underlying felony offense. See State v. Denton, 938 S.W.2d 373, 379 (Tenn. 1996); State v. Zirkle, 910 S.W.2d 874, 890 (Tenn. Crim. App. 1995). In that the double jeopardy clause was not implicated in the Petitioner's convictions, counsel cannot be faulted for failure to raise such claim.

The Petitioner next argues that his attorneys were ineffective for failing to object to the trial court's instruction on flight. He argues that because there was no evidence of flight, counsel committed a critical error in failing to object when the instruction was given. We disagree.

The instruction given to the jury on flight reads as follows:

The flight of a person accused of a crime is a circumstance which, when considered together with all of the facts of the case, may justify an inference of guilt. Flight is the voluntary withdrawal of one's self for the purpose of evading arrest or prosecution for the crimes charged. Whether the evidence presented proves beyond a reasonable doubt that the defendant fled is a question for your consideration.

The law makes no nice or refined distinction as to the manner or method of a flight. It may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown to constitute flight.

If flight is proved, the fact of flight alone does not allow you to find that the defendant is guilty of the crime alleged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all of the other evidence when you decide the guilt or innocence of the defendant. On the other hand, an entirely innocent person may take flight and such flight may be explained by proof offered or by the facts and circumstances proved in the case. Whether there was flight by the defendant, or the reasons for it, and the weight to be given it are questions for you to determine.

In Hall v. State, 584 S.W.2d 819, 821 (Tenn. Crim. App. 1979), this

Court quoted 29 Am. Jur. Evidence § 280 at 329 on the issue of flight:

The fact that a defendant after the commission of a crime concealed himself or fled from the vicinity where the crime was committed, with knowledge that he was likely to be arrested for the crime or charged with its commission, may be shown as a circumstance tending to indicate guilt.

In Rogers v. State, 2 Tenn. Crim. App. 491, 455 S.W.2d 182, 187 (Tenn. Crim. App. 1970), this Court set out a two-prong test for determining whether the facts of a case were indicative of flight:

> The law makes no nice or refined distinction as to the manner or method of a flight; it may be open, or it may be a hurried or concealed departure, or it may be concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

Contrary to the Petitioner's assertions, there is evidence in the record to justify this instruction. At the motion to suppress hearing and at trial, Detective Wiser testified that the Petitioner had told him that he had slept under an interstate bridge the night before he was taken into custody. Also, Detective Parker testified that when he had taken the Petitioner into custody, the Petitioner had told the man who had accompanied Detective Parker in searching for the Petitioner that he (the Petitioner) had been hiding under the bridge all day and had thought about turning himself in. At trial, Ms. Wallace Smith Bailey, a neighbor of the Jeffers, testified that on the night of the murder, the Petitioner had knocked on her door and asked to use the telephone. He called Mr. Jeffers and told him to come home because the victim could not be revived. As he was leaving, Ms. Bailey asked the Petitioner why did he not call an ambulance. He told her that it was too late for that. After Mr. Jeffers arrived at the Jeffers home and took the victim to the hospital, Ms. Bailey watched the Petitioner put on a jacket from the house, walk down the steps, and leave the scene. Cumulatively, this evidence was sufficient to warrant an instruction on flight. Trial counsel was not ineffective for failing to object to this instruction.

Last, the Petitioner claims that counsel was ineffective for not raising the issue that because the Petitioner was not taken before a magistrate promptly, his statement to police should be suppressed. According to the Petitioner, he was not taken before a magistrate until about a week after his arrest. The Petitioner relies upon the supreme court's holding in State v. Huddleston, 924 S.W.2d 666 (Tenn. 1996) in support of his claim. In Huddleston, 924 S.W.2d at 670-71, the court held that a delay of seventy-two hours before bringing the Petitioner before a magistrate violated Rule 5(a), Tenn. R. Crim. P. and the Fourth Amendment to the U.S. Constitution.

The Court must initially note that the decision in Huddleston had not been rendered at the time of the petitioner's trial. Moreover, State v. Readus, 764 S.W.2d 770 (Tenn. Crim. App. 1988), a decision relied upon in Huddleston, was not issued until two years after the Petitioner's trial. Accordingly, it would seem inappropriate to fault counsel for failing to raise an issue relying upon authority in a supreme court decision filed nine years after the Petitioner's trial.

Nonetheless, in addressing the Petitioner's implication that he was illegally detained at the time of his statements to the police, thus requiring the suppression of those statements, we conclude that the Petitioner would not be entitled to relief. In Huddleston, the Tennessee Supreme Court concluded that a statement given in violation of Tenn. R. Crim. P. 5(a) need not be suppressed if the statement was voluntarily given under the totality of the circumstances. Huddleston, 924 S.W.2d at 670 (citing Readus, 764 S.W.2d at 774); see also State v. Middlebrooks, 840 S.W.2d 317, 327-28 (Tenn. 1992). The Tennessee Supreme Court has already determined on direct appeal that the Petitioner's

confession was voluntarily given under the totality of circumstances test. State v. Irick, 762 S.W.2d at 126-27.

However, in addressing the claim of a Fourth Amendment violation, the Huddleston court noted that "[i]f the probable cause determination does not occur within forty-eight hours, 'the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance.'" 924 S.W.2d at 672 (citing County of Riverside v. McLaughlin, 500 U.S. 44, 57, 111 S. Ct. 1661, 1670 (1991)). For the purpose of determining the admissibility of the Petitioner's statements, assuming that a McLaughlin violation has occurred, the question becomes whether the statement was sufficiently an act of free will to purge the primary taint of the unlawful invasion. Huddleston, 924 S.W.2d at 674 (citing Brown v. Illinois, 422 U.S. 590, 598, 95 S. Ct. 2254, 2259 (1975) and Wong Sun v. United States, 371 U.S. 471, 486, 83 S. Ct. 407, 416 (1963)). In determining whether a sufficient act of free will exists, the court suggested that the following four factors be considered:

      (1)    the presence or absence of Miranda warnings;

      (2)    the temporal proximity of the arrest and the confession;

      (3)    the presence of intervening circumstances; and

      (4)    the purpose and flagrancy of the official misconduct.

Huddleston, 924 S.W.2d at 674-75. The burden of proving the admissibility of the challenged evidence by a preponderance of evidence rests upon the prosecution. Id. at 675.

We conclude that the record reflects sufficient attenuation to permit the introduction of the Petitioner's statement. Most importantly, the Petitioner's statement was obtained within two hours of his arrest. Thus, the statement was given to the police before the Petitioner's detention would have purportedly ripened into a constitutional violation. The only evidence presented at the post-conviction hearing concerning illegal detention was the Petitioner's testimony that he believed he was in jail about a week before he was taken before a judge for his initial appearance. The Petitioner was repeatedly advised of his rights at the time of his arrest and throughout the interrogation process. Finally, the Petitioner does not argue, nor could he, that his initial arrest was not supported by probable cause. Under these circumstances, it would appear that the Petitioner's statement would not have been subject to suppression under Huddleston, even if it had been in effect at the time of the Petitioner's trial. This claim is without merit.

## II. BRADY VIOLATION

The Petitioner asserts that the state withheld eleven items of exculpatory evidence in violation of the Supreme Court's decision in Brady v. Maryland, 376 U.S. 83, 83 S. Ct. 1194 (1963). The following documents and photographs were submitted by Petitioner at the post-conviction hearing:

Exhibit 1    An unsigned and undated document purportedly written by Kathy Jeffers (Kenneth Jeffers' wife) to the district attorney's office consisting of a list of questions which would implicate Mr. Jeffers in the murder of the victim.

Exhibit 3    A Department of Human Services report with the date of complaints listed as

February 2, March 7, and March 29, implicating Mr. Jeffers, Pamela Jeffers, and Vickie Jeffers in the physical abuse of Mr. Jeffers' two minor children.

Exhibit 4   A Knox County Juvenile Court order declaring Mr. Jeffers' three minor children dependent and neglected and awarding custody of the children to the Department of Human Services due to "continual excessive discipline" by Mr. Jeffers, Pamela Jeffers, and Vickie Jeffers.

Exhibit 5   Foster Care Plans for Mr. Jeffers' two male children from 1980 to 1982 suggesting that the biological mother, the stepmother, and Mr. Jeffers attend counseling dealing with parenting skills.

Exhibit 6   Redetermination of Eligibility for Title XX Services made in 1981 and 1982, a letter to Judge Carey Garett dated March 23, 1984, from the Department of Human Services concerning Mr. Jeffers' attempt to regain custody of his minor daughter, and reports of home studies made in 1983, suggesting that all three minor children be placed in the custody of Mr. Jeffers.

Exhibit 7   Redetermination of Eligibility for Title XX Services made in 1982 recommending that Mr. Jeffers' two minor sons remain in foster care because Mr. Jeffers had not obtained parental counseling.

Exhibit 8   Letter to Judge Brenda Wagner dated March 23, 1994, from the Department of Human Services detailing Mr. Jeffers' and Kathy Jeffers' home situation and explaining that the Petitioner also lived in the home and "appeared stable "and had "been observed taking good care of the children during a surprise home visit" while Mr. and Ms. Jeffers were working.

Exhibit 9   Department of Human Services report dated December 23, 1984, substantiating abuse of Mr. Jeffers' minor daughter while in the custody of Mr. Jeffers and Kathy Jeffers.

Exhibit 10    Department of Human Services reports concerning Mr. Jeffers' two minor sons dating from 1979 until 1982.

Exhibit 11    A Department of Human Services report dated April 26, 1985, in which the worker visited the Jeffers home after the victim's death and Mr. Jeffers at first was hostile and then requested counseling for himself and his son.

Exhibit 17    Photographs of the victim's home on the night of the murder.

According to both trial counsel, none of this information was provided to them prior to trial.

The state contends that in reference to Exhibit 1, the claim that a Brady violation occurred must fail because the Petitioner did not demonstrate that the state suppressed this information. At the hearing, Assistant District Attorney General David Jennings testified that he did not recall ever having seen Exhibit 1. The state claims that because this document was unsigned and undated, there is no evidence to demonstrate at what point this information came into the possession of the state. The state further contends that the Petitioner has failed to prove that the document was material.

As to Exhibits 3 through 11, again the state claims that the Petitioner has failed to demonstrate that the state suppressed the information because there is nothing to indicate at what point the Department of Human Services records came into the possession of the state. Also, as in Exhibit 1, the state contends that this evidence was not material.

Last, the state contends the Petitioner has failed to prove that the photographs introduced as Exhibit 17 were suppressed because there was unrefuted testimony that the procedure would have been that the photographs would have been kept by the Criminalistics Division of the Police Department and that they would have been available to defense counsel at all times. Again, the state argues that the photographs were not material.

In the landmark case of Brady v. Maryland, 373 U.S. 83, 83 S.Ct.1194, 10 L. Ed. 2d 215 (1963), the United States Supreme Court held that the prosecution has a constitutional duty to furnish the accused with exculpatory evidence pertaining to either the accused's guilt or innocence and the potential punishment that may be imposed. Failure to reveal exculpatory evidence violates due process where the evidence is material either to guilt or punishment, irrespective of good faith or bad faith of the prosecution. Brady, 373 U.S. at 87, 83 S. Ct. at 1196-97. The prosecution must also disclose evidence which may be used by the defense to impeach a witness. Giglio v. United States, 405 U.S. 150, 154-5, 92 S. Ct. 763,766 (1972); Workman v. State, 868 S.W.2d 705, 709 (Tenn. Crim. App. 1993); State v. Davis, 823 S.W.2d 217, 218 (Tenn. Crim. App. 1991).

Before a reviewing court may find a due process violation under Brady, all of the following four prerequisites must be satisfied:

> (1)　The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the state is bound to release the information whether requested or not);
>
> (2)　The state must have suppressed the information

-31-

>  (3)     The information must have been favorable to the
>          accused; and
>
>  (4)     The information must have been material.

State v. Edgin, 902 S.W.2d 387, 390 (Tenn.) amended on reh'g, (Tenn. 1995). Our examination of the record leads us to the conclusion (1) that the information was requested; (2) that the Petitioner failed to prove that the information was suppressed by the state; (3) that the information may have been favorable to the defendant; but (4) that the information was not material under the standards of Kyles v. Whitley, 514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). In Kyles, 115 S. Ct. at 1566, the United States Supreme Court pronounced the standard by which the materiality of undisclosed information is measured, holding that, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." See also Edgin, 902 S.W.2d at 390. Thus, in order to prove a Brady violation, a defendant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict." Id.

In the case at bar, trial counsel testified at the evidentiary hearing that he had had a problem with discovery in this case and that he had specifically requested information about Mr. and Ms. Jeffers' background. The direct appeal record reflects that, through counsel, the Petitioner filed an extensive discovery motion. Among the items sought were:

> The criminal record, including any juvenile record, or any prior conviction of any person who may be called as a witness. While not limited to, specific request is made for the criminal records, adult and juvenile, if any,

-32-

> of Kathy Ann Dyer Jeffers and Kenneth Michael Jeffers.

The state appealed the trial court's granting of the motion, asserting that the trial court abused its discretion because Rule 16(a)(1)(B), Tenn. R. Crim. P., only provides that upon the defendant's request the state must furnish a copy of the defendant's prior criminal record and does not require the production of criminal records of witnesses. Citing Graves v. State, 489 S.W.2d 74, 83 (Tenn. Crim. App. 1972), this Court held that in the interest of justice, a trial court may grant such a request. State v. Billy Ray Irick, C.C.A. No.1060, Knox County. (Tenn. Crim. App., Knoxville, Apr. 18, 1986).

At the evidentiary hearing, the Petitioner presented no evidence as to when the state received either the letter purportedly written by Ms. Jeffers or the DHS records. The letter was undated and unsigned. We cannot, therefore, undeniably conclude that the state withheld this evidence.

We also cannot conclude that the evidence was material. In regard to the letter purportedly written by Ms. Jeffers, trial counsel for the Petitioner testified that he was not sure if Ms. Jeffers testified to anything inconsistent with the questions referred to in the letter. Furthermore, the fact that Mr. Jeffers was initially the prime suspect was brought out at trial.

As for the DHS records, none of the documents deal with Kenneth Jeffers' abuse of the victim. The Petitioner has failed to demonstrate how prior allegations of child abuse would have affected either the guilt or the penalty phase of the trial. Again, the defense presented evidence at the guilt phase that

-33-

Kenneth Jeffers was initially considered the prime suspect in this case, but the state's evidence refuted this theory. It was the Petitioner who called Mr. Jeffers at work to tell him that the victim had stopped breathing. It was the Petitioner who stated that he could not remember what happened on the night of the murder. It was the Petitioner's pubic hair that matched hair found inside the victim. Moreover, one of the reports concluded that one of Mr. Jeffers' natural children should be returned to him.

Although the petitioner contends that information in the records concerning surprise visits in which he was found to be taking good care of the children would have been favorable and material, the record reveals that this information was also brought out during the testimony of Mr. and Ms. Jeffers. Both testified that the Petitioner had lived with the family for two years and had not given them any cause for concern in regard to his relationship with the children.

In summary, we conclude that the Petitioner has failed to show: (1) that the state suppressed the above mentioned evidence and (2) that said evidence, under the Kyles "materiality standard," was material. The absence of the unsigned, undated, and untitled letter and the DHS records of Mr. and Ms. Jeffers did not deprive the petitioner of a fair trial and did not undermine faith in the verdict reached by the jury. In light of the evidence presented at trial, even had this information been disclosed, there is not a reasonable probability that the result would have been different. See Edgin, 902 S.W.2d at 390. This issue is without merit.

## II. AGGRAVATING CIRCUMSTANCES

The Petitioner next asserts that all four aggravating circumstances found by the jury are invalid, and therefore, the death penalty must be set aside. The state relied upon and the jury found applicable the following four aggravating circumstances to warrant the death penalty:

> (1) The crime was committed against a person less than twelve (12) years of age and the defendant was eighteen (18) years of age or older;
>
> (2) The murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind;
>
> (3) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and
>
> (4) The murder was committed while the defendant was engaged in committing the felony of rape, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit rape.

Tenn. Code Ann. §§ 39-2-203(i)(1), (5), (6), and (7)(1985).

The Petitioner first argues that two of the aggravating circumstances found to exist by the jury are invalid under State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992). He asserts that the aggravating circumstance that the murder was committed during the perpetration of a rape and the circumstance concerning the age of the victim and the defendant are invalid because they did not narrow the classes of persons eligible for the death penalty when the defendant was convicted of felony murder and the felony was aggravated rape.

In Middlebrooks, the supreme court held that the felony murder aggravator cannot be used to support a death sentence in felony murder cases because this aggravating circumstance does not narrow the death eligible class of defendants who are convicted of felony murder. In ruling, the court said:

> We have determined that in light of the broad definition of felony murder and the duplicating language of the felony murder aggravated circumstance, no narrowing occurs under Tennessee's first-degree murder statute. We hold that, when the defendant is convicted of first-degree murder solely on the basis of felony murder, the aggravating circumstance set out in T.C.A.§ 39-2-203(i)(7) (1982) and 39-13-204(i)(7) (1991), does not narrow the class of death-eligible murderers sufficiently under the Eighth Amendment to the U.S. Constitution and Article I, § 16 of the Tennessee Constitution because it duplicates the elements of the offense. As a result, we conclude that Tenn. Code Ann. § 39-2-203(I)(7) is unconstitutionally applied under the Eighth Amendment to the U.S. Constitution and Article I, § 16 of the Tennessee Constitution where the death penalty is imposed for felony murder. Accordingly, we expressly overrule State v. Smith, 755 S.W.2d 757 (Tenn. 1988) and its progeny on this issue.

Middlebrooks, 840 S.W.2d at 346. The court has subsequently held that the holding in Middlebrooks should be applied retroactively. Barber v. State, 889 S.W.2d 185, 186-87 (Tenn. 1994).

The state concedes that the felony murder aggravator was improperly applied in this case, but argues that the application of this aggravator is harmless beyond a reasonable doubt. In State v. Howell, 868 S.W.2d 238 (Tenn. 1993), the court adopted the harmless error standard used by the United States Supreme Court in Stringer v. Black, 503 U.S. 222 , 112 S. Ct. 1130, 117 L. Ed. 2d 367 (1992), for determining whether the improper application of the felony murder aggravator could be considered harmless beyond a reasonable doubt. In Howell, our supreme court held the following:

> In order to guarantee the precision that individualized sentencing considerations demand and

> provide a principled explanation for our conclusion in each case, it is important, when conducting harmless error review, to completely examine the record for the presence of factors which potentially influence the sentence ultimately imposed.

868 S.W.2d at 260-61.  These factors include, without limitation, the following:

> (1)  The number and strength of remaining valid aggravating circumstances;
>
> (2)  The prosecutor's argument at sentencing;
>
> (3)  The evidence admitted to establish the invalid aggravator; and
>
> (4)  The nature, quality, and strength of the mitigating evidence.

Id. at 261.  In the case at bar, we conclude that in reviewing the applicability and reweighing of the three remaining aggravating factors, any error was harmless under Howell.

The Petitioner contends that the aggravating circumstance regarding the ages of the defendant and the victim must also fail under Middlebrooks.  The Petitioner maintains that the rape was considered aggravated because the victim was less than thirteen (13) years of age and that one of the applicable aggravating factors found by the jury was that the victim was less than twelve (12) years of age and the defendant older than (18) years of age.  He argues that this situation is analogous to Middlebrooks in that the conviction of the defendant of the underlying felony would automatically make him death-qualified, and therefore the aggravating circumstance would not narrow the class of persons eligible for the death penalty.

The application of the age enhancement factor is distinguishable from the problem in Middlebrooks. In order to convict the Petitioner of felony murder, the state simply had to prove that he committed murder in the perpetration of a rape. Tenn. Code Ann. § 39-2-202 (a) (1982). The victim's age was relevant in convicting the Petitioner of aggravated rape, but it was not relevant in determining whether the petitioner was guilty of felony murder. The victim's age is not an element of the offense of felony murder, and accordingly, a Middlebrooks problem does not exist.

Moreover, allowing the victim's age to be used as an aggravating circumstance does narrow the class of death eligible defendants. Offenders who kill young victims during a rape are a distinct subset of all murderers, and even a subset of all felony murderers. Therefore, this aggravating circumstance sufficiently narrows the class of death eligible defendants, and this aggravator was properly applied.

The Petitioner next argues that the "heinous, atrocious, or cruel" aggravating circumstance is unconstitutionally vague. However, the Tennessee Supreme Court has consistently upheld the constitutionality of this aggravating circumstance. See State v. Cazes, 875 S.W.2d 253, 267 (Tenn. 1994), cert. denied, 115 S. Ct. 743 (1995); State v. Black, 815 S.W.2d 166, 181 (Tenn. 1991). In the case at bar, the jury was instructed as to the terms of the statute and was given definitions for the terms. This issue is without merit.

The Petitioner also argues that the evidence was insufficient to support the jury's application of this aggravating circumstance. However, this

-38-

issue was raised on direct appeal, and the Supreme Court concluded that the evidence was more than adequate to establish all the elements of this aggravating circumstance. State v. Irick, 762 S.W.2d at 134. This issue has therefore been previously determined. See House v. State, 911 S.W.2d 705, 711 (Tenn. 1995).

Last, in regard to this aggravating circumstance, the Petitioner contends that the application of this circumstance does not sufficiently narrow the class of death eligible defendants. Again, however, the Tennessee Supreme Court reviewed the application of this aggravator in light of the definition in State v. Williams, 690 S.W.2d 517, 532 (Tenn. 1985), and concluded that it was constitutionally acceptable and properly applied in the case at bar. State v. Irick, 762 S.W.2d at 132-34.

The Petitioner next contends that the evidence is insufficient to support application of the aggravating circumstance that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another. In State v. Smith, 868 S.W.2d 561, 580-81 (Tenn. 1993), the Tennessee Supreme Court held that for purposes of applying this circumstance, the state need only prove that at least one motive for killing was the prevention of prosecution.

In this case, the jury convicted the Petitioner of two counts of aggravated rape. The evidence supports this conviction. Also, the evidence was uncontested that the victim knew the Petitioner and that the Petitioner fled the scene after Kenneth Jeffers took his daughter to the hospital. Under these facts,

a reasonable juror could have found that the Petitioner killed the victim, in part, because he did not want her to identify him as the perpetrator of the aggravated rape. See State v. Smith, 857 S.W.2d 1, 14 (Tenn. 1993), cert. denied, 114 S. Ct. 561 (1993). Moreover, this inference is further strengthened by the fact that after fleeing the scene, the Petitioner admitted that he had hid under a bridge for most of the day following the murder.

As previously stated, this Court concludes that the Middlebrooks error was harmless beyond a doubt. In conducting the Howell analysis, the Court must first consider that the jury correctly applied the three remaining aggravating circumstances. The proof clearly supports their application.

Secondly, we must consider the extent to which the prosecutor emphasized the invalid felony-murder aggravator in his closing argument at sentencing. The record reveals that the prosecutor only briefly discussed this aggravator at sentencing.

Thirdly, all of the evidence concerning the murder being committed during the course of aggravated rape was admitted during the guilt phase, and the jury could have considered the fact that the murder was committed during the rapes as part of the circumstances of the crime and the character of the Petitioner.

Last, in examining the nature, quality, and strength of the mitigating evidence, the record reveals that mitigation evidence was admitted through Nina Braswell Lunn, a licensed clinical social worker, who testified concerning the

Petitioner's early psychiatric problems and institutionalizations. The assistant district attorney who handled the Petitioner's initial arraignment was also called to testify that the Petitioner offered to plead guilty before being asked to plead guilty or not guilty. The court gave the following instructions to the jury on mitigation: (1) that the Petitioner had never before been convicted of a felony; (2) that the Petitioner had never been arrested or convicted of a misdemeanor involving moral turpitude; (3) that the Petitioner had a history of mental impairment; (4) that the Petitioner was under the influence of alcohol or marijuana at the time of the offense; (5) that the Petitioner had attempted to obtain help for the victim after the crime; and (6) that the Petitioner had shown remorse. There was evidence in the record dealing with all of the above factors, but the jury could have justifiably concluded that it was not substantial enough to outweigh the aggravating factors. On rebuttal at sentencing, the state presented the testimony of Dr. Clifton Tennison, Jr., the psychiatrist who examined the Petitioner concerning his mental condition at the time of the crime and his competency to stand trial. Dr. Tennison testified that it was his opinion that there was no medical or psychiatric evidence to support incompetence to stand trial or reason to support an insanity defense. He further testified that the Petitioner suffers from an anti-social personality disorder. Based upon a thorough review of the record, after careful analysis in conformity with Howell, we conclude , beyond a reasonable doubt, that the sentence would have been the same had the jury given no weight to the invalid felony-murder aggravating factor. This issue is without merit.

## CONCLUSION

After a thorough review of this record and the briefs filed on behalf of the parties, we conclude that the evidence does not preponderate against the findings of the trial court. The judgment of the trial court is thereby affirmed. The sentence of death will be carried out as provided by law on the 5th day of May, 1998, unless otherwise ordered by the Tennessee Supreme Court or other proper authority.

_____
THOMAS T. WOODALL, Judge

CONCUR:

_____
DAVID H. WELLES, Judge

_____
JOHN K. BYERS, Senior Judge