IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 1, 2005

## ERIC BERNARD CHISM v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Madison County**
**No. C-03-167     Roger A. Page, Judge**

---

**No. W2004-01690-CCA-R3-PC  - Filed May 5, 2005**

---

The petitioner, Eric Bernard Chism, appeals from the Madison County Circuit Court's dismissal of his petition for post-conviction relief, through which he had attacked his Madison County jury convictions of felony murder, especially aggravated kidnapping, aggravated rape, and aggravated sexual battery. The post-conviction court determined that the petitioner failed to establish his claims of ineffective assistance of trial counsel.  We conclude that the record supports this adjudication and affirm the order.

**Tenn. R. App. P. 3; Judgment of the Circuit Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and J.C. MCLIN, JJ., joined.

C. Anne Tipton, Memphis, Tennessee, for the Appellant, Eric Bernard Chism.

Paul G. Summers, Attorney General & Reporter; Preston Shipp, Assistant Attorney General; James G. Woodall, District Attorney General; and Al Earls, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

Convicted in 2000 of first degree felony murder, especially aggravated kidnapping, aggravated rape, and aggravated sexual battery and serving an effective sentence of life without the possibility of parole plus 25 years, the petitioner filed a petition for post-conviction relief on May 12, 2003. Following an evidentiary hearing, the post-conviction court denied relief.  Now on appeal, the petitioner claims that he was denied the effective assistance of counsel at trial.

This court affirmed the petitioner's convictions on direct appeal.  *See State v. Eric Bernard Chism*, No. W2001-01287-CCA-R3-CD (Tenn. Crim. App., Jackson, Nov. 8, 2002), *perm. app. denied* (Tenn. 2003).  This court's opinion recapitulates the evidence admitted at trial:

On December 17, 1998, shortly before 4:00 p.m., the nude body of Beatrice Sue Westbrooks was found in a grassy area off of Algie Neely Road in Madison County. The police were summoned, and the assistant county coroner pronounced Ms. Westbrooks dead at the scene. The victim's identity was unknown at the time.

The following day, Dr. O.C. Smith, the Shelby County Medical Examiner, performed an autopsy and determined that the cause of death was multiple injuries. The victim had sustained four gunshot wounds to the head and upper body. There were crushing-type injuries involving the chest, abdomen, and extremities that were consistent with a vehicle having run over the body; the victim's upper arms, ribs, and pelvic girdle were fractured, and the crushing force applied to the abdominal area had split the flesh causing the intestines to extrude. The body also exhibited signs of strangulation and vaginal penetration. The injuries, Dr. Smith testified, were inflicted contemporaneously and while the victim was still alive. Dr. Smith was unable to provide an accurate estimate of the time of death.

. . . .

[On] March 28, 2000, . . . an eyewitness to the crimes[, Melanie Black,] identified the defendant and Calvin Lyons as the men who kidnapped and murdered Ms. Westbrooks.

. . . .

At the time Westbrooks was murdered, Melanie Black was admittedly a prostitute and crack cocaine drug user. When she testified at trial, she also was a convicted felon serving a three-year sentence for theft of a truck. Black knew the defendant and Lyons before Westbrooks' death. She had purchased crack cocaine from the men. Black testified that on December 17, 1998, she contacted "June" Lyons to meet her at Fuel Mart near Wilhite's Truck Stop to buy some crack cocaine. The defendant and Lyons arrived in a pickup truck, and the three left with Black sitting in the middle of the truck seat.

Black testified that at some point during the ride the defendant asked Lyons if the police were behind them. Black turned and in the truck bed "saw somebody's legs taped together in a blanket." She could not tell who the person was. The defendant ordered Lyons to

-2-

blindfold Black and put her in the floorboard. Black testified that she did not know how long or to where they drove. When they stopped, they removed her blindfold. Black described the area as somewhere in the county off the road.

While Black remained in the truck, the defendant and Lyons removed the woman from the bed of the truck and took her to the front of the vehicle. Black did not recognize the victim. The woman was unclothed, and the men began hitting and kicking her. After a time, the men took Black out of the truck. They forced the victim to perform oral sex on Black. Black testified that the victim was upset and pleading with the men. Black said that she kept telling the victim that she was sorry. One of the men hit Black in the nose, and Lyons told her to get into the truck.

Black testified that once inside the truck, she saw the defendant grab the victim by the back of the hair and pull her to her knees. The defendant drew a gun from behind his back. Black described what followed: "And he shot her somewhere in – towards her head. I don't know exactly where. And I put my head down, and the gun went off two more times." Black testified that she did not see the other shots because she had her head in her hands, but she certainly heard them.

Black testified that, after the shots were fired, the men took turns raping her in the front seat of the truck. First, the defendant raped her while Lyons held a gun to her head. Black admitted that she did not fight, but she testified that she did not consent to the sex. Afterwards, the men again blindfolded Black and put her in the truck floorboard. They drove awhile, and Lyons told her to get up in the seat. Lyons undid the blindfold, and the defendant stopped the truck and went into a store. When the defendant returned, the men drove Black to her apartment complex and let her out by the soft drink machine. Black testified that before driving off, the defendant told her that if she "ever said anything about this, what happened to [her] would be worse." The defendant also threatened her that she better pay him that night the money that she owed him for drugs.

Black testified that she "went to work" and earned the money. Later that night, she contacted Lyons and told him that she had the defendant's money. The defendant collected his money and sold Black more crack cocaine. Black explained that she did not report anything to the police because she was scared. After that night, Black

admitted that she "worked for" the defendant and Lyons a few times. The men would take her places to serve as a prostitute, collect the money, and give her crack cocaine.

Black eventually left town. She testified that she became afraid "something was fixing to happen" to her. She and a male friend left the state in a stolen vehicle. They were arrested in the stolen vehicle in Ohio, and Black was transported to Tennessee. After her arrest, Black told the police about the homicide and about her own brutal treatment. When Black learned the victim's identity, Black realized that she had encountered the victim a "couple of times in passing," including once at a crack house on Gordon Street. Black accompanied Sergeant Rudder to various locations to try and identify where the events occurred, and she estimated the time of the events to have been between 1:00 and 2:00 in the afternoon, with the men leaving her at the apartment shortly after 3:00 p.m. Based upon Black's account of events, the defendant and Lyons were also separately charged with the aggravated kidnapping of Black and two counts of aggravated rape.

At trial, Black insisted that she had no agreement or "deal" in connection with her testimony. Predictably, the defense vigorously attacked her credibility. Regarding the stolen vehicle conviction, the defense elicited that Black originally pleaded guilty with an agreement for a three-year, community corrections sentence. Black testified that as part of the agreement she was also told that after successfully completing community corrections, the felony conviction would be expunged from her record. Within a couple of weeks of her community corrections placement, however, Black was arrested on drug charges. According to Black, when she appeared in court on the community corrections revocation warrant, she entered a "new plea" to a three-year incarcerative sentence, which she currently was serving.

On cross-examination, Black stated that when she called Lyons from Fuel Mart, she asked only for $60 worth of cocaine, although she had earned several hundred dollars from prostitution the previous evening. Black claimed that she had been smoking crack cocaine all morning before going to Fuel Mart to eat, talk with some truck drivers, and use the outside telephone. When the defendant and Lyons arrived, Black described their vehicle as an older model green and white pickup truck.

The defense also covered several inconsistencies between Black's trial testimony and other statements she had given. For example, in her preliminary hearing testimony, Black said that when she "turned around to look, [she] saw a naked woman in the back of the truck." She did not mention a body wrapped in a blanket with legs taped together. Also, in her previous statements, Black maintained that she never got out of the truck, and she never mentioned the men forcing the victim to perform oral sex on her. At the preliminary hearing, Black admitted that after the Westbrooks slaying, she had consensual sex with the defendant on more than one occasion.

In addition to Black's eyewitness testimony, the state offered the testimony of Christopher Williams, who had pending charges for aggravated burglary and was incarcerated in the Madison County jail. Williams' prior criminal history included convictions for reckless endangerment, aggravated assault, failure to appear, and attempted second-degree murder. Williams testified that he first encountered the defendant in March 2000, when he and the defendant were assigned to the same cell block in the jail.

Williams and the defendant had many conversations. Williams testified that the defendant admitted that he was in jail for killing a girl, and the defendant bragged that "the detectives and everybody wouldn't be able to prove it because she wasn't nothing but a crack head and that the one witness that the state had was telling a lie to cover her own ass."

Williams testified that the defendant talked about some of the details of the crimes. Williams said that the defendant told him about driving into a field by a tree. Lyons held Black at gunpoint, and the defendant told Black, "[Y]ou see what happens when you don't pay, when you run off and don't do what you're supposed to do. Do you think we playing at this or do you think this is some kind of joke?" The defendant told Williams that at that point Lyons interrupted, told the defendant to do what he was supposed to do, and said, "We ain't got time to be out here messing around." Williams testified that the defendant said he then shot the victim. The defendant also related that Lyons next shot the victim and that the two men beat and kicked the victim in the crotch. Afterwards, the men drove Black to her apartment. According to Williams, the defendant never explained how he met the victim, but the defendant said that he met Black at a strip place and that Black "started turning tricks" for the defendant.

-5-

Williams explained that his motivation for testifying was twofold. First, he was trying to "lighten the load" regarding his own criminal charge. Second, Williams testified that the defendant's callous remarks about the victim being a "crack head whore" bothered him because Williams' sister took drugs and easily could have met a similar fate. On cross-examination, Williams admitted that Sergeant Rudder assured him that if he testified, the state would recommend an incarcerative sentence of eleven months and 29 days on his pending burglary charge.

At the conclusion of the state's case, the trial court ruled that if the defendant testified, his prior drug conviction could be used to impeach his credibility. The defendant declined to testify, and he did not offer any proof in defense.

The jury convicted the defendant of the offenses specific to Westbrooks: premeditated, first-degree murder, first-degree murder in the perpetration of an especially aggravated kidnapping, especially aggravated kidnapping, aggravated rape, and aggravated sexual battery. On the remaining counts involving Black, the jury found the defendant not guilty. The trial court imposed an effective sentence of life plus 25 years. The defendant has timely appealed his convictions and sentencing.

*Id.*, slip op. at 2-6 (footnote omitted).

In the post-conviction evidentiary hearing, the petitioner testified that while he was in custody pending trial, trial counsel came to see him at the jail five or six times. The petitioner opined that he had sufficient opportunity to discuss the facts and potential defense theories with counsel. He testified that a teacher at his son's school could have served as an alibi witness because she saw the petitioner picking up his son at school at the time of the kidnapping and murder. The petitioner testified that he gave the teacher's name to trial counsel, along with the names of his mother and aunt, both of whom, the petitioner testified, could have served as alibi witnesses. At one point, counsel told the petitioner that the alibi witnesses would not make good witnesses.

The petitioner testified that his trial counsel told him that the state would not furnish him with an investigator. A "Crimestopper" call had given the name of Ollie Russell as one who had been involved in the murder, but counsel did not interview Russell until during the petitioner's trial.

The petitioner testified that counsel explained neither the petitioner's right to testify and to decline to testify nor the petitioner's power to make that choice. However, the petitioner

acknowledged that counsel "advised [him] not to" testify and that the petitioner made that choice.

Before trial, the petitioner told counsel that he would be willing to submit to DNA testing, but counsel replied that the state had no evidence to serve as a basis for DNA comparison.

The petitioner claimed at the evidentiary hearing that he wanted trial counsel to call his employer of eight years as a "credibility" witness, but counsel never talked to the employer.

The petitioner testified that, until the day before the scheduled trial, he was to be tried jointly with co-defendant Lyons, his cousin. On the eve of trial, the trial court severed the co-defendants but only postponed the petitioner's trial one day. Counsel told him that the severance "put him in a bind" because of the two attorneys' joint preparation.

Trial counsel testified in the evidentiary hearing. He stated that a May 4, 2004 tornado had destroyed his retired-file storage room and that his file in the petitioner's case was apparently lost as a result. He testified that the petitioner's trial was probably his third or fourth murder trial and that he had handled approximately 20 jury trials prior to the petitioner's trial. He was appointed to represent the petitioner prior to his preliminary hearing in general sessions court and remained on the case through the circuit court trial.

Counsel testified that he requested funds for an investigator, but because the position of trial judge was vacated for a long time period without a successor judge chosen, he was unable to obtain a ruling on the request. While the request for funding for an investigator was pending, counsel hired two investigators in succession, using funds furnished by the petitioner's family. Counsel did not recall whether the request for state funding was denied or abandoned.

Counsel testified that he talked with several witnesses. He "stayed in contact" with Wayne Lott, the petitioner's employer, who provided counsel with information about the petitioner. Counsel talked with the petitioner's family, including his aunt and mother. He testified that the investigator made a "reconstructive video" of the truck stop where Ms. Black claimed to have been picked up by the petitioner and his cousin. Counsel used the video to prepare his cross-examination of Ms. Black but did not introduce the video into evidence. Counsel did not visit the crime scene where the victim's body was found, but he testified that he reviewed the state's photographs of the scene.

Counsel testified that he filed standard motions for discovery and that he received the customary "open file" discovery that the state afforded defense attorneys in Madison County. He testified that he took full advantage of this discovery and reviewed and copied portions of the state's file. He testified that he would have looked at the file once or twice more before trial, and he probably looked at it shortly before the trial commenced. In the spring before the petitioner's September 2000 trial, counsel found out about a "jailhouse snitch," Jason Scott Thomas. Counsel talked to Thomas and concluded that he would be ineffective as a witness. Counsel learned of

Williams' claim a few days before trial to have overheard inculpatory statements made by the petitioner when in jail. Counsel recalled that the petitioner allegedly made statements to Williams during the Summer of 2000. Ultimately, Williams testified at trial, but Thomas did not. Counsel did not remember whether he talked with Williams prior to trial.

Due to the emergence of Williams as a witness to the petitioner's inculpatory statements, the petitioner's co-defendant sought a severance on the eve of trial. The court granted the motion. Counsel testified that the petitioner did not want a continuance of the trial. Counsel explained that the main drawback to the severance was that the co-defendant's counsel had prepared to cross-examine Dr. O.C. Smith, the medical examiner. Counsel stated, however, that prior to Dr. Smith testifying, the co-defendant's counsel helped him interview Dr. Smith.

The petitioner's counsel testified that he had prepared to cross-examine Ms. Black. Counsel testified that, prior to trial, Ms. Black refused to talk to him or his investigator. Counsel did travel to Henning, Tennessee, to interview Ms. Black's accomplice in a truck theft, for which Ms. Black was in custody when she first claimed to have information about the crimes of which the petitioner was ultimately convicted. Also, counsel obtained Ms. Black's pretrial statement and "extensively" cross-examined her at the petitioner's preliminary hearing.

Counsel testified that the state had no DNA evidence that could have provided a link to the petitioner. He opined that, in that situation, there was no DNA comparison to be sought that could have exonerated the petitioner. He pointed out that he made no request for a semen analysis of tissue from the victim's body because the rape of the victim was allegedly performed with "some type of instrument." He testified that the results of a DNA test on the victim's fingernail scrapings were not obtained or revealed until after he was replaced by new counsel during the pendency of the motion for new trial.

Counsel testified that he investigated the possible involvement of Ollie Russell in the kidnapping and murder of the victim. The defense investigator interviewed Russell before trial, and counsel interviewed him at the courthouse on the eve of or during trial. Counsel disdained using Russell as a witness because his prior statement detailed the petitioner's drug sales to prostitutes in Madison County.

When asked about his request during trial that no lesser included offenses be charged, counsel testified that the petitioner was "adamant from day one that he didn't commit this crime," and counsel believed that instructions on lesser included offenses would have been "inconsistent" with the defense that the petitioner was innocent and that Ms. Black lied. Essentially, noted counsel, the defense was that "'[w]e didn't do this, she's not telling the truth,' and it's either she is correct and it's a first degree murder case or she's not and he's not guilty."

Counsel testified that he had no recollection of any plea offer, much less one that entailed a 12-year sentence.

Counsel recalled that he often discussed with the petitioner "at just about every stage of the proceedings" the issue of whether the petitioner should testify. Of concern were the petitioner's two prior felony convictions, and when the trial court ruled that the prior convictions would be admissible for impeachment purposes, the petitioner opted not to testify. The trial court conducted a *voir dire* of the petitioner about his rights and his decision not to testify.

Following the evidentiary hearing, the post-conviction court entered a very thorough finding of fact and order denying post-conviction relief.

In post-conviction proceedings, the petitioner has the burden of proving by clear and convincing evidence the claims raised. Tenn. Code Ann. § 40-30-110(f) (2003). On appeal, the lower court's findings of fact are reviewed *de novo* with a presumption of correctness that may only be overcome if the evidence preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

When a petitioner challenges the effective assistance of counsel, he has the burden of establishing (1) deficient representation and (2) prejudice resulting from that deficiency. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 2064 (1984); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Deficient representation occurs when counsel's services fall below the range of competence demanded of attorneys in criminal cases. *Bankston v. State*, 815 S.W.2d 213, 215 (Tenn. Crim. App. 1991). Prejudice is the reasonable likelihood that, but for deficient representation, the outcome of the proceedings would have been different. *Overton v. State*, 874 S.W.2d 6, 11 (Tenn. 1994). Courts need not address both *Strickland* components in any particular order or even address both if the petitioner fails to meet his burden with respect to one. *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). On review, there is a strong presumption of satisfactory representation. *Barr v. State*, 910 S.W.2d 462, 464 (Tenn. Crim. App. 1995).

In evaluating counsel's performance, this court should not examine every allegedly deficient act or omission in isolation, but rather we view the performance in the context of the case as a whole. *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The primary concern of the court should be the fundamental fairness of the proceeding being challenged. *Id.* Therefore, this court should not second-guess tactical and strategic decisions of defense counsel. *Henley*, 960 S.W.2d at 579. Instead, this court must reconstruct the circumstances of counsel's challenged conduct and evaluate the conduct from counsel's perspective at the time. *Id.*; *see also Irick v. State*, 973 S.W.2d 643, 652 (Tenn. Crim. App. 1998). A court must

> "consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated trivial effect. . . ."

*Henle*y, 960 S.W.2d at 580 (quoting *Strickland*, 466 U.S. at 696-97, 104 S. Ct. at 2069).

## I. Investigation.

On appeal, the petitioner first claims that trial counsel failed to properly investigate the case.

### A. Failure to Obtain Funding for an Investigator.

He asserts counsel was ineffective in failing to obtain state funding for an investigator, but privately-retained investigators were utilized. The petitioner made no showing either of deficient representation or how he was prejudiced by any lapse of investigation.

### B. Failure to Interview or Call Witnesses.

The petitioner complains that counsel failed to conduct pretrial interviews of all potential witnesses, especially alibi witnesses. On this point, however, the petitioner failed to call the witnesses in the evidentiary hearing. When a post-conviction petitioner claims that counsel failed to locate, interview, or call a witness for trial, any finding of ineffective assistance of counsel must be predicated upon that witness' testifying in the evidentiary hearing as means of establishing what testimony the witness would have offered at trial. *Black v. State*, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990). Thus, the claim of ineffectiveness in failing to interview potential witnesses fails.

### C. Failure to Present Evidence.

The petitioner next claims that counsel was deficient in failing to utilize the "reconstruction" videotape to cross-examine Ms. Black about the logistical improbabilities of her description of being picked up by the petitioner prior to the victim's murder. This issue was not articulated in the post-conviction petition, *see State v. Smith*, 814 S.W.2d 45, 49 (Tenn. 1991) (post-conviction issues limited to those raised in the pleading), and was not adjudicated by the post-conviction court, *see* Tenn. R. App. P. 36(a) ("[R]elief may not be granted in contravention of the province of the trier of fact."). At any rate, the petitioner presented neither Ms. Black nor the videotape at the evidentiary hearing, leaving the post-conviction court and this court to merely speculate what impact the reconstruction cross-examination would have had at trial. Thus, he established no basis for a finding of ineffective assistance of counsel in failing to utilize the videotape. *See Black*, 794 S.W.2d at 757-58.

### D. Failure to Visit the Crime Scene.

The petitioner complains that trial counsel failed to visit the location in the woods where the victim was murdered. Trial counsel testified that he was familiar with the general area

in which the victim's body was found and that he saw photographs of the specific site. The petitioner demonstrated no prejudice from counsel's failure to physically visit the location.

E. Failure to Call Russell as a Witness.

The petitioner claims that counsel was ineffective in failing to call Ollie Russell as a trial witness to exploit the "Crimestopper" tip that Russell was a suspect. The petitioner's investigator interviewed Russell prior to trial, and trial counsel interviewed him at the courthouse during the trial. Counsel determined that Russell's testimony would be detrimental to the defense because he claimed to know that the petitioner sold drugs to prostitutes. We discern, as apparently did trial counsel, that such testimony suggests a motive for killing the victim in the presence of a witness, and we defer to counsel's tactical decision not to sponsor Russell as a witness. At any rate, Russell did not testify in the evidentiary hearing, and prejudice from the failure to develop him as a trial witness was not shown. *See Black*, 794 S.W.2d at 757-58.

## II. DNA Evidence.

In this issue, the petitioner argues that counsel should have pursued a DNA comparison of known tissue from the petitioner with tissue retrieved from scrapings of the victim's fingernails. He asserts that trial counsel merely ascertained pretrial whether the state possessed any DNA evidence that inculpated the petitioner and that counsel failed to pursue the possibility of DNA comparisons that might exculpate him. During the pendency of the petitioner's motion for new trial, he obtained a comparison of his known DNA with DNA previously obtained from scrapings of the victim's fingernails, and apparently, the results of the comparison were inconclusive.

Even if trial counsel should have learned about the existence of the tissue from the scrapings, the petitioner has not demonstrated how the failure to develop this evidence for trial prejudiced him.

## III. Pretrial Motions.

Next, the petitioner characterizes counsel's failure to make certain pretrial motions as ineffective assistance. Specifically the petitioner challenges counsel's failure to pursue his motion for state funding for an investigator, the failure to move for a bill of particulars, and the failure to move for a continuance in the wake of the trial court's order of severance of co-defendants.

We disagree with the petitioner's appellate argument that the record supports a finding of prejudice resulting from the failure to make and pursue these motions.

A. Investigator Funding.

Trial counsel testified that, due to an extended vacancy in the trial judge's position, he was unable to have his request for state funding for an investigator determined as the trial date

approached. In lieu of state funding and in view of the passing of time, the petitioner's family provided some funding for engaging an investigator, and an investigator was employed and utilized. Moreover, as we have noted above in this opinion, the petitioner has not established by clear and convincing evidence how he was prejudiced by any lapse in pretrial investigation.

B. Bill of Particulars.

The petitioner claims that specificity of the time of the victim's death would have been gleaned from a bill of particulars and would have advanced the development of alibi evidence and assisted counsel in the cross-examination of the medical examiner. Significantly, however, the petitioner failed to establish whether any time-of-death specificity could have resulted from a bill of particulars and, if so, how it would have enabled the development of an alibi defense or benefitted the defense in the cross-examination of the medical examiner. We are simply asked to speculate that a bill of particulars would have provided consequential information. This claim of ineffectiveness of counsel was not established.

C. Continuance.

The petitioner complains that counsel did not move for a continuance in the wake of the trial court's eve-of-trial severance of co-defendants. We agree with the state, however, that a one-day continuance was afforded the defense and that the petitioner opposed any additional postponement of the trial. The petitioner has failed to establish either deficient performance or prejudice from the lack of an additional postponement. In this situation, the petitioner failed to establish by clear and convincing evidence that counsel was ineffective in failing to gain a further postponement of the trial.

## IV. Cumulative Ineffective Assistance.

Finally, the petitioner claims that the cumulative effect of instances of deficient performance of trial counsel yields an inescapable conclusion that prejudice occurred. We disagree. Although many of the issues of ineffective assistance raised in this appeal have been rejected because the petitioner failed to establish prejudice with respect to these issues, it does not follow that, at some point, the sheer number of such issues would serve to meet the prejudice prong of *Strickland*. *See William Glenn Wiley v. State*, No. M2003-00661-CCA-R3-PC (Tenn. Crim. App., Nashville, Sept. 23, 2004). In any event, the burden still rests upon the petitioner to show by clear and convincing evidence that prejudice of such a residual or cumulative type occurred, and he has failed to do so in this case. Essentially, we discern no basis in the record for a court of competent jurisdiction losing confidence in the fair outcome of the petitioner's trial proceedings.

## V. Conclusion.

The record supports the post-conviction court's denial of relief. Accordingly, the dismissal of the petition is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE