IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 13, 2005

## MARK GRIFFIN v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Anderson County**
**No. A4CR0175     James B. Scott, Jr., Judge**

---

**No. E2005-01568-CCA-R3-PC - Filed January 23, 2006**

---

The petitioner, Mark Griffin, appeals from the Anderson County Criminal Court's dismissal of his petition for post-conviction relief, through which he had challenged his conviction of first degree felony murder. On appeal, the petitioner claims that ineffective assistance of trial counsel and certain due process violations invalidate his convictions. We disagree and affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON and DAVID G. HAYES, JJ., joined.

Brian J. Hunt, Clinton, Tennessee, for the Appellant, Mark Griffin.

Paul G. Summers, Attorney General & Reporter; Renee W. Turner, Assistant Attorney General; and James N. Ramsey, District Attorney General, for the Appellee, State of Tennessee.

### OPINION

The evidence presented in the petitioner's trial was thoroughly summarized by this court in the petitioner's direct appeal opinion:

> At trial, the State first presented the testimony of the victim's wife, Geneva Brown. Geneva Brown testified that her husband, Fred, was a former Tennessee State Trooper and electrician. . . . [I]n response to his wife's concerns [about the victim being robbed], the victim began placing a small amount of money in his shirt pocket with a larger amount of cash rolled up in the pocket of his pants. The victim also placed a video camera in the car lot's office in order to record the activities on the parking lot.

Geneva Brown last saw her husband alive on February 17, 1999. On that day, in response to a telephone call, she went to the car lot, arriving as emergency personnel were taking the victim from the office. Although she was unable to speak with the victim, she heard "muffled sound" and noticed that he was moving. After the victim's death, police returned to her approximately six thousand dollars which they had found in a roll in her husband's pants pocket.

Sometime before trial, Ronald Austin spoke with the [petitioner] regarding the offense. At trial, Austin testified that the [petitioner] told Austin that he was charged with "shooting an ex-cop." According to Austin, the [petitioner] and another individual were together and "in the context of it the guy got shot." The [petitioner] related that the other individual was caught[,] and "he tried to put everything on [the petitioner]."

Wendy Carroll lived next door to F & G Auto Sales. She knew the victim and would occasionally chat with him. On the day of the offense, at approximately 5:30 p.m., the attendant from the car lot came to her house and told her that the victim needed an ambulance. . . . Accordingly, she immediately went to the car lot office where she found the victim "laying in the corner of the business." Carroll identified herself and told the victim that he had been shot. When she asked the victim if he knew the identity of his attackers, he responded that he did not know who they were, but related that the attackers were black. Carroll did not immediately realize the severity of the victim's injuries. She noted that "[o]n his face, one of his eyes, the cornea of his eye[,] it was, it looked like it had been torn off or partially torn off." Carroll's twelve-year-old son, who had accompanied her to the office, called for assistance.

Jason Taylor, a firefighter and emergency medical technician, responded to the 911 call from F & G Auto Sales. . . . [U]pon arrival he was advised that the owner of the business had been shot. Taylor immediately called the Clinton Police Department. Taylor testified that the victim was found lying behind a desk. He had two gunshot wounds, one on the left chest and one "towards the neck." The victim was conscious and informed Taylor that he had been shot with a small caliber weapon. The victim also advised Taylor that his attackers had left the scene.

. . . .

Scott Campbell, a paramedic[,] . . . saw the victim lying behind a desk and noticed that he had several gunshot wounds. Campbell helped cut the victim's clothing from his body and confirmed that the clothing was left at the scene.

Mike Norris was a nurse onboard the Lifestar helicopter on February 17, 1999 [and testified that] . . . Dr. Blaine Enderson of the University of Tennessee Medical Center pronounced the victim dead on arrival at the hospital.

On February 17, 1999, Bobbie Riggs was living at 2740 West Wolfe Valley Road in Anderson County. When Riggs arrived home at approximately 5:30 p.m., she found a video tape in her driveway. Riggs noticed that the tape appeared to be broken. She took the tape into the house and placed it on a counter. Later that evening, Riggs discovered that the police were searching for a video tape that was missing from F & G Auto Sales. Riggs called the home of her neighbor, Avery Johnson, who was employed with the sheriff's department. Riggs spoke with Johnson's wife who called police. Shortly thereafter, an officer was dispatched to Riggs' home to retrieve the video tape. Riggs testified that she did not attempt to play the video tape and relinquished it to police exactly as she found it.

Officer Rick Scarbrough, an officer with the Clinton Police Department, testified that at approximately 8:00 p.m. on February 17, 1999, he went to Riggs' residence to obtain a video tape. Officer Scarbrough testified that he became involved after receiving a telephone call from Judy Johnson. After obtaining the video tape, Officer Scarbrough placed it in a brown paper bag and took it to Assistant Chief David Queener of the Clinton Police Department. Assistant Chief Queener instructed Officer Scarbrough to take the video tape to the Movie Station, a movie sales and rental business. Janine Starnes, an employee of Movie Station, repaired the video tape. Officer Scarbrough observed Starnes remove the video tape from the damaged casing, cut approximately one-half inch of the video tape from either side of a tear in the video tape, splice the tape back together, and wind it into a new casing. After the repairs, Officer Scarbrough returned the video tape to Assistant Chief Queener.

Officer Donald McClendon of the Knoxville Police Department testified that on February 17, 1999, he participated in the

arrest of the [petitioner] at the [petitioner's] home on Valley View in Knox County. . . . .

On February 17,1999, Robbie Phillips was employed as a mechanic at F & G Auto Sales. He had worked for the victim for approximately one year. Phillips testified that the victim had a video camera in the window of the office and also a television which allowed them to monitor activity on the car lot. The video tapes were changed daily. On the day of the offense, at approximately 4:00 to 4:30 p.m., Phillips looked out the glass door of the office and observed two black men looking at a red Ford car. One man was wearing a black jacket and the other man was wearing a green jacket. Shortly thereafter, the men came into the office. The man in the black jacket approached the victim while the man in the green jacket approached Phillips. The man in the black jacket advised the victim that "it was a robbery." Phillips was then struck twice, once in the right eye and once on the back of his head, rendering him unconscious.

When Phillips regained consciousness, he was lying on the floor with his hands bound behind his back with duct tape. The victim, who was lying on the floor behind the desk, told Phillips that he had been shot, and asked Phillips to call 911. Realizing that the office telephone had been jerked from the wall, Phillips ran next door for assistance. He then returned to the office with Carroll.

Phillips testified that he had watched the video tape of the offense and had also listened to the audio which was recorded inside the office.[1] He had never heard the voices of the perpetrators prior to the day of the offense. Phillips said that the victim had been to the bank earlier in the day and that the victim carried cash in his shirt pocket. Phillips identified the [petitioner] and Joe Gallaher. At trial, Phillips identified the [petitioner] as the perpetrator who hit the victim.

Dr. Cleland Blake performed the autopsy on the victim on February 18, 1999. Dr. Blake concluded that the cause of death was "aspiration asphyxia." At trial, he testified that the victim had sustained two gunshot wounds. "One of [the wounds] was clearly not lethal and one would have been lethal had he not suffered severe injuries to his face which caved in the left side of his facial bones and

---

[1] Phillips identified the voices on the tape as his own, that of the victim, and the perpetrators.

-4-

broke vessels going into the sinuses." The "nonlethal" bullet entered around the right side of the victim's neck and came out just above the breast bone. The second bullet entered the chest near the right nipple, traveled down through the chest and abdomen, "causing gradual bleeding into the abdomen," and eventually "came to rest over the hip bone." This wound, left untreated, would have been fatal. However, death was actually caused by "severe injuries to his face which caved in the left side of his facial bones and broke vessels going into the sinuses." The facial wounds resulted in the victim "aspirating, sucking the blood from his caved[-]in face down into his bronchial passages into his lungs causing asphyxia or failure to get oxygen." Essentially, the victim choked to death on his own blood. Dr. Blake opined that the facial wounds were caused by

> a broad heavy or flat object. These are not inflicted by fists. They are not inflicted by, I don't think that they are the butt of a gun unless it's a very broad butt of a gun. It could have been a piece of timber. Some of these could have been inflicted by crashing into a table, a wall, a piece of furniture, or indeed the floor, but . . . a simple fall did not cave in the left facial bones and cause the hemorrhage which bled into that.

At the time of trial, David Queener was the Assistant Chief of the Clinton Police Department. On February 17, 1999, Assistant Chief Queener was a Captain in charge of the Patrol and Detective Division of the Clinton Police Department. He testified that he had known the victim for approximately fifteen years and was familiar with his voice. Prior to the date of the offenses, he did not know Phillips. However, he did know the [petitioner] and Gallaher and was familiar with their voices. After listening to the voices on the tape, Assistant Chief Queener recognized the voices of Gallaher and the [petitioner] as those of the perpetrators. Assistant Chief Queener also determined after viewing the video tape that the [petitioner] entered the office first and was wearing a green jacket; Gallaher followed the [petitioner] into the office and was wearing a black jacket. Assistant Chief Queener maintained that Phillips was mistaken in stating that the [petitioner] wore a black jacket during the offense.

Assistant Chief Queener later requested that the Knox County Police Department compile computer-generated photographic line-ups, specifically asking that photographs of Gallaher and the [petitioner] be included. Two line-ups were created; one for the identification of Gallaher and one for the identification of the [petitioner]. A computer randomly placed both Gallaher and the [petitioner] in the number two position. Assistant Chief Queener asserted that because the line-ups were generated by a computer located at the Knox County Police Department, he was unable to change the position of either man. From these line-ups, Phillips positively identified Gallaher and the [petitioner] as the perpetrators. Additionally, Assistant Chief Queener noted that the video tape revealed that the perpetrators drove a 1979 yellow Mercury automobile to the car lot. The car shown in the video tape was registered to Daphene Crowley.

George Wilson testified that he also worked at F & G Auto Sales. Through various familial relations, Wilson was acquainted with Gallaher and the [petitioner]. Both men had been to Wilson's home on various occasions. Wilson believed that Gallaher and the [petitioner] were cousins because they typically called each other "cuz." Wilson viewed the video tape and identified the 1979 Mercury on the tape as the vehicle that Gallaher was driving at the time of the offenses. From the video tape, Wilson recognized Gallaher and the [petitioner] as the perpetrators. Moreover, he positively identified their voices after hearing them call each other "cuz" on the tape. Wilson also related that the victim normally carried around one hundred dollars ($100) in his shirt pocket and also carried money in his pants pocket.

Billy Paul Brown testified that he, Gallaher, and the [petitioner] were cousins. On February 22, 1999, Gallaher was arrested at Billy Paul Brown's trailer. The black jacket seized by the police belonged to Gallaher. Billy Paul Brown stated that Daphene Crowley was Gallaher's girlfriend. Moreover, after reviewing the video tape he recognized the voices and faces of Gallaher and the [petitioner] as the perpetrators.

Eldridge Douglas testified that, prior to his retirement in October 1999, he was a detective with the Clinton Police Department. Douglas had known the victim, the [petitioner], and Gallaher for years. Initially, Douglas was in charge of the investigation of the robbery and shooting of the victim. He was called to the scene and

noticed that Phillips appeared to have been hit with something. Douglas ultimately retrieved a roll of six thousand dollars ($6000) from a pocket of the victim's pants. On February 17, 1999, after viewing the tape, Douglas visually identified Gallaher as one of the perpetrators. He also recognized the voices of the victim, Gallaher, and the [petitioner]. Specifically, Douglas stated that "I had talked to [the petitioner]. But the day that we went to . . . interview him, I was absolutely positive that it was his voice."

Douglas explained that he obtained a black jacket that was in Gallaher's possession when he was arrested. Additionally, when Douglas saw the green jacket in the possession of the Knoxville officers [who arrested the petitioner], he recognized it as the one worn by the petitioner during the robbery and took possession of the jacket.

Finally, Richard Whitt, an officer with the Clinton Police Department, testified that he was well-acquainted with Gallaher and the [petitioner] and knew that Gallaher and the [petitioner] were cousins. When Whitt viewed the video tape for the first time on the day after the shooting, he recognized Gallaher and the [petitioner]. He also recognized the [petitioner's] voice. Furthermore, Whitt noted that the [petitioner] entered the office first and was followed by Gallaher. Whitt maintained that the transcript of the video tape accurately reflected the proceedings on the video tape. Moreover, Whitt was aware that Gallaher and the [petitioner] frequently called each other "cuz"; however, Whitt conceded that the term is frequently used among friends and relatives.

*State v. Mark A. Griffin*, No. E2001-02006-CCA-R3-CD, slip op. at 2-7 (Tenn. Crim. App., Knoxville, Jan. 22, 2003), *perm. app. denied* (Tenn. May 19, 2003) (footnotes omitted).

In his post-conviction evidentiary hearing, the petitioner complained that his trial counsel failed to seek an instruction to limit the jury's use of a surveillance videotape of the offense in progress, failed to challenge the chain of custody of the videotape, failed to challenge Austin's testimony, and, during his closing argument, admitted incompetence. The petitioner also testified that the state tried his co-defendant first and, during the co-defendant's trial, advanced the theory that the petitioner shot the victim. He testified that, in his own trial, the state theorized that the petitioner commanded the co-defendant to shoot the victim.

In the evidentiary hearing, the petitioner's trial counsel testified that he believed he sought an instruction to direct the jury to regard the videotape – and not a transcript thereof – as the direct evidence.

-7-

Counsel recalled that, although he objected to the state's proposed use of Austin as a witness and obtained a jury-out hearing on his objection, the motion was denied. The court did avail, however, counsel an opportunity to interview Austin. Counsel opined that the interview opportunity was adequate but that he had had no time to investigate Austin's background. He testified that Austin's testimony proved not to be detrimental to the defense, and counsel limited his cross-examination of Austin in an effort to avoid any damage.

Counsel did not challenge the chain of custody of the videotape because he discerned no break in the officers' custody of the tape, and Ms. Riggs had testified that she found the tape and turned it over to the officers in the same condition in which she found it.

Counsel testified that he sat through a large portion of the petitioner's co-defendant's trial and had conferred with the co-defendant's counsel. Counsel acknowledged that he mentioned during closing argument in the petitioner's trial that the defense had been handicapped in mustering resources to defend the charge.

Counsel testified that he had obtained a pretrial mental evaluation of the petitioner, and the resulting report availed no possibility of an impairment. The petitioner's family members declined to testify in the petitioner's behalf.

In its written order, the post-conviction court held that the petitioner failed to establish any constitutional infirmity and denied relief.

On appeal, the petitioner alleges that he received ineffective assistance of trial counsel via counsel's failure (1) to request a continuance upon the surprise emergence of Austin as a trial witness, (2) to fully cross-examine Austin to expose credibility issues, and (3) to seek a limiting instruction on the jury's use of the videotape. The petitioner also claims on appeal that he was denied a fair trial because (1) the trial court allowed the officers to submit a transcript of an audio portion of the videotape which ascribed certain incriminating statements to the petitioner and (2) the state pursued inconsistent theories at the separate trials of the co-defendant and petitioner.

In post-conviction proceedings, the petitioner has the burden of proving by clear and convincing evidence the claims raised. Tenn. Code Ann. § 40-30-110(f) (2003). On appeal, the lower court's findings of fact are reviewed de novo with a presumption of correctness that may only be overcome if the evidence preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). "Claims of ineffective assistance of counsel are considered mixed questions of law and fact and are subject to de novo review." *Serrano v. State*, 133 S.W.3d 599, 603 (Tenn. 2004); *see State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999).

When a petitioner challenges the effective assistance of counsel, he has the burden of establishing (1) deficient representation and (2) prejudice resulting from that deficiency. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 2064 (1984); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Deficient representation occurs when counsel's services fall below

-8-

the range of competence demanded of attorneys in criminal cases. *Bankston v. State*, 815 S.W.2d 213, 215 (Tenn. Crim. App. 1991). Prejudice is the reasonable likelihood that, but for deficient representation, the outcome of the proceedings would have been different. *Overton v. State*, 874 S.W.2d 6, 11 (Tenn. 1994). Courts need not address both *Strickland* components in any particular order or even address both if the petitioner fails to meet his burden with respect to one. *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). On review, there is a strong presumption of satisfactory representation. *Barr v. State*, 910 S.W.2d 462, 464 (Tenn. Crim. App. 1995).

In evaluating counsel's performance, this court should not examine every allegedly deficient act or omission in isolation, but rather we view the performance in the context of the case as a whole. *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The primary concern of the court should be the fundamental fairness of the proceeding being challenged. *Id.* Therefore, this court should not second-guess tactical and strategic decisions of defense counsel. *Henley*, 960 S.W.2d at 579. Instead, this court must reconstruct the circumstances of counsel's challenged conduct and evaluate the conduct from counsel's perspective at the time. *Id.; see also Irick v. State*, 973 S.W.2d 643, 652 (Tenn. Crim. App. 1998). A court must

> "consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated trivial effect. . . ."

*Henley*, 960 S.W.2d at 580 (quoting *Strickland*, 466 U.S. at 696-97, 104 S. Ct. at 2069).

In light of the overwhelming evidence presented at trial and the record of the post-conviction proceeding before us, we need not belabor our analysis of the ineffective assistance of counsel issue. Prior to the commencement of testimony in the petitioner's trial, counsel objected to the state's use of Austin as a witness on the grounds of surprise and lack of disclosure, although it is unclear whether a request for a continuance was included in the remedy sought. The trial court denied the motion but availed counsel an opportunity to interview Austin prior to the commencement of testimony. Counsel opined that this opportunity for an interview was adequate. Although counsel also opined that he had no adequate opportunity to investigate Austin's background to find impeachment material, the petitioner failed to show in the post-conviction hearing that any such investigation would have been beneficial to the trial defense. Counsel's decision to engage Austin in only a limited cross-examination was well within counsel's prerogative to make tactical decisions.

The petitioner also failed to show that counsel's handling of the videotape and videotape transcript evidence was substandard. Counsel opined that no basis for a challenge to the chain of custody of the tape existed, and the record supports this opinion. Even if counsel did not request an instruction to require the jury to focus upon the tape itself and not the officers' transcription of the audio portion of the tape, the petitioner has demonstrated no prejudice. Several

witnesses testified that they recognized the petitioner's image and his voice on the tape. Essentially, the evidence against the petitioner was overwhelming, and we cannot even theorize a basis upon which a limiting instruction about the jury's consideration of the transcript would have produced a different result at trial.

We now turn to the issues of the denial of a fair trial due to the unfettered use of the tape transcript and the state's claimed inconsistent pursuit of theories at successive trials. These issues could have been presented by the petitioner in his direct appeal. For this reason, they are waived in the post-conviction context. *See* Tenn. Code Ann. § 40-30-106(g) (2003) (providing that a ground for post-conviction relief is generally waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented).

We hold that the record supports the post-conviction court's judgment, and we affirm.

_____
JAMES CURWOOD WITT, JR., JUDGE