IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 9, 2007 Session

## RICKEY WILLIAMS v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-26607     Carolyn Wade Blackett, Judge**

---

**No. W2006-00605-CCA-R3-PC  - Filed July 24, 2007**

---

The petitioner, Rickey Williams, appeals the Shelby County Criminal Court's denial of his petition for post-conviction relief from his conviction for first degree premeditated murder and resulting life sentence.  On appeal, he contends that he received the ineffective assistance of counsel and that the trial court gave an erroneous jury instruction on the definition of "knowing."  Upon review of the record and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID G. HAYES and J.C. MCLIN, JJ., joined.

Larry M. Sargent, Memphis, Tennessee, for the appellant, Rickey Williams.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Stacy McEndree, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

### I.  Factual Background

A jury convicted the petitioner of murdering Algerine Bougard in her apartment on or about December 1, 1997.  In the petitioner's direct appeal, this court gave the following factual account of the crime:  The victim and the petitioner had been involved in a romantic relationship that became very violent in the months leading up to the victim's death.  See State v. Rickey Williams, No. W1999-01701-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 109, at *2 (Jackson, Feb. 15, 2001), perm. to appeal denied, (Tenn. 2001).  At trial, an employee of the victim's apartment complex testified that in the summer of 1997, the petitioner forced his way into the complex and knocked the victim unconscious by hitting her with an object in a brown sack.  Id. at **2-3.  Memphis Police Officer Frank Winston testified that on June 30, 1997, he was dispatched to the victim's apartment

and saw that the victim was cut and bruised.  She told him the petitioner had entered her apartment through the sliding glass door, had held a knife to her throat, and had beaten and raped her.  Id. Deborah Thweatt, a hospital nurse, testified that she cared for the victim in November 1997 while the victim spent time in the hospital for an intestinal disorder.  Id.  Toward the end of November, Thweatt heard the victim screaming in her hospital room.  Id. at *4.  Thweatt went into the room and saw the petitioner beating the victim and demanding her purse.  Id.  The petitioner threatened to kill the victim and Thweatt and fled with the purse, which contained the victim's apartment keys.  Id. On December 1, 1997, the victim was released from the hospital, and her daughter, Catilla Bradley, drove her home.  Id.  The victim used an extra set of keys to get into her apartment, and Bradley went to the petitioner's parent's house to retrieve the victim's purse.  Id. at **4-5.  Bradley got the purse, but the victim's apartment keys were not in it.  Id. at *5.  Several days later, the victim's body was discovered in her apartment.  Id.  A key to the front door had been broken off in the lock, another set of keys was on the couch, and the sliding glass door on the apartment balcony had been forced open.  Id.  Fingerprints recovered from the sliding glass door and from a beer can found on top of a trash can in the kitchen matched the petitioner.  Id.  According to a pathologist, the victim had been stabbed and strangled.  Id.  She had bruises all over her body, and semen was in her mouth and vagina.  Id.

This court affirmed the petitioner's first degree premeditated murder conviction.  Id. at *13. Subsequently, the petitioner filed a petition for post-conviction relief, claiming that he received the ineffective assistance of trial counsel, in pertinent part, because Catilla Bradley gave unexpected and damaging testimony during cross-examination; trial counsel failed to challenge the State's fingerprint expert; trial counsel failed to object to Officer Winston's testimony regarding the victim's excited utterances; trial counsel failed to ask for a curative instruction when Officer Winston testified that the victim looked like a rape victim; and trial counsel failed to seek an independent mental evaluation for the petitioner.  The petitioner also claimed the trial court improperly instructed the jury on "knowing."

At the evidentiary hearing, the petitioner testified that he currently was taking the medications Elavil, Haldol, Cogentin, and Thorazine, which affected his memory, but that he could remember what happened at his trial.  He stated that he met with his attorney only one time prior to trial and that the meeting lasted about thirty minutes.  The petitioner told counsel about potential witnesses who had seen the victim arguing with some women before the victim's death.  However, counsel did not talk with the petitioner about the witnesses, did not show him any discovery that counsel received from the State, never talked with him about a theory of defense, never talked with him about the State's case or the charges against him, and never talked with him about the State's DNA or fingerprint evidence.  The petitioner told counsel that the victim had falsely accused him of rape on June 30, 1997, because the petitioner was going to leave the victim for another woman. He also told counsel that Deborah Thweatt was lying about seeing the petitioner beat the victim. Counsel told the petitioner he was going to hire an investigator for the case but never did.  Counsel never asked the petitioner about any physical conditions that would have prevented the petitioner from climbing onto the victim's third-floor balcony.  The petitioner stated that his knees would

"swell up" with fluid sometimes, which affected his ability to climb, and that he told counsel about his medical history.

The petitioner testified that he told counsel he needed a mental evaluation because he was upset, nervous, and "just wasn't feeling right." The petitioner received a mental evaluation at Midtown Mental Health, and the evaluation concluded he was competent to stand trial. However, the doctor who evaluated him did not ask any questions about his mental health history and did not conduct any tests. The petitioner said he began taking mental health medications in 1982, was diagnosed with schizophrenia in 1985 because he was hearing voices, and tried to commit suicide three or four times. He stated that he was diagnosed with depression in 1990 and spent time at Charter Lakeside Hospital in 1994 and 1996. At the time of the victim's death, the petitioner was taking only one medication, Haldol. Counsel never asked the petitioner about his mental health history and never discussed a diminished capacity defense with him.

On cross-examination, the petitioner testified that he and the victim were married in 1996, and he acknowledged that rape and aggravated assault charges were pending against him at the time of the victim's death. He stated that he was hearing voices "off and on" in December 1997 but that he was not hearing voices at the time of the murder because he was taking his medication. He said that voices did not tell him to kill the victim and that he had not been hospitalized since January 1996. He said he told counsel he had spent time in a mental hospital and was taking medication. He said that he did not really understand what was going on during his trial and that he did not remember the trial court asking him if he knew what was going on. The petitioner said that he did not know if counsel conducted any investigation in the case but that the defense called two witnesses, Henry Partee and John Danner, to testify about seeing the victim arguing with some women on the day of her death. However, Partee and Danner testified that they did not know anything about the argument. The petitioner stated that at the time of the victim's death, he was still living with the victim, which explained why his fingerprints were in her apartment. However, he stated that he had not been in the apartment for about one month at the time of the murder and that he was maintaining his innocence. On redirect examination, the petitioner testified he was using cocaine and having hallucinations in December 1997. He stated that although he had been living with the victim, he did not have keys to her apartment and sometimes would enter the apartment by going through the balcony door.

The petitioner's trial attorney testified as an adverse witness for the petitioner that he met the petitioner sometime in the 1980's and represented the petitioner in some "minor matters" before representing the petitioner in this case. The petitioner never told trial counsel he was taking Haldol or had mental disorders, but counsel requested a mental evaluation because that was his standard procedure in first degree murder cases. The evaluation concluded the petitioner was competent, and counsel discussed the results of the evaluation with the petitioner. Neither the petitioner nor counsel was surprised about the evaluation's results, and counsel did not request a second evaluation because he saw no indication the petitioner needed one. The petitioner communicated very well with counsel, was very upbeat, and was interested in his case. Counsel was not aware the petitioner had suffered from depression, and the petitioner's family never told counsel that the petitioner had any

mental problems or was addicted to drugs. Counsel also was unaware the petitioner had attempted suicide or had been hospitalized previously.

Counsel testified that fingerprint expert James Hill testified for the State about fingerprints recovered from the victim's apartment. Counsel did not challenge Hill's expert qualifications because Hill had testified in other trials and was qualified to testify in this case. Counsel also did not challenge Hill's qualifications because he wanted to cross-examine Hill about unidentified prints found on the victim's sliding glass door. Counsel hired Investigator Clark Chapman to work on the petitioner's case, and counsel spoke with Partee and Danner, who the petitioner claimed could help his case. The petitioner also claimed that a man named James Henderson killed the victim, but counsel could not find Henderson. At first, counsel believed the State's theory of the case, i.e., that the petitioner had entered the victim's apartment by climbing up to her third-floor balcony, was "farfetched." However, after counsel visited the victim's apartment, he realized the State's theory was plausible. Counsel never asked the petitioner if the petitioner had any physical limitations that would have prevented him from climbing onto the victim's balcony, and the petitioner could not give an alibi for the time around the victim's death. The petitioner's post-conviction attorney showed trial counsel the petitioner's medical and mental health records from the 1990's. Counsel stated that he had never seen the records before and acknowledged that they showed the petitioner suffered from arthritis, schizoaffective disorder, depression, and drug and alcohol addiction.

Trial counsel testified that he did not interview Catilla Bradley before trial because she had refused to give a statement. At trial, counsel cross-examined Bradley about whether the victim's keys were in the victim's purse when Bradley picked up the purse from the petitioner's parents. Counsel knew that the petitioner's parents were going to testify for the defense that the keys were in the purse when they gave it to Bradley. Therefore, counsel thought Bradley also would say the keys were in the purse. However, Bradley testified that the keys were not in the purse and that the petitioner's father told her the petitioner had taken the keys. Counsel acknowledged he did not object to this hearsay statement.

Counsel acknowledged that he did not give a copy of discovery materials to the petitioner but said he went over the State's evidence with him. Counsel said that he met with the petitioner at the jail "quite a bit," that the petitioner adamantly maintained he was not in the victim's apartment and did not kill the victim, and that the petitioner claimed James Henderson killed the victim. Given the petitioner's assertions, counsel did not consider using a diminished capacity defense. Counsel stated that in a jury-out hearing, he objected to Officer Winston's testimony regarding the victim's statements to him on June 30 as prior bad act evidence and hearsay. However, the trial court overruled the objection. During Officer Winston's testimony, counsel also objected when Officer Winston testified that the victim looked like a rape victim. The trial court sustained that objection, but counsel did not move for a mistrial or ask for a curative instruction.

On cross-examination, trial counsel testified that at the time of the evidentiary hearing, he had been practicing law in Tennessee for almost thirty-eight years and had taken about twenty murder cases to trial. He stated that he met with the petitioner in jail about ten times and that his

-4-

goal was to find James Henderson. Counsel stated that the trial court instructed the jury on "knowing" for second degree murder, not first degree murder. Counsel was surprised by Catilla Bradley's answer to his question about the keys in the purse and her statement that the petitioner's father told her the petitioner took the keys. However, he did not object to her hearsay testimony "since I'm the one who asked the question." When the trial court sustained counsel's objection to Officer Winston's stating the victim looked like a rape victim, counsel did not ask for a curative instruction because he did not want the jury to hear for a second time that the victim had been raped. Counsel did not believe failing to ask for a curative instruction affected the jury's verdict. Counsel discussed the result of the petitioner's mental evaluation with the petitioner, and the petitioner never indicated he believed the result was wrong. The petitioner never told counsel he was hearing voices or having nightmares, and counsel said he had no basis to ask for a second mental evaluation.

Assistant District Attorney General James Wax testified for the State that he prosecuted the petitioner's case. The State had an open-discovery policy with the defense, and Wax met with the petitioner's trial attorney about the case. The petitioner's attorney filed motions, including a motion for a mental evaluation. Several jury-out hearings were held in the case, and Wax believed trial counsel was a zealous advocate for the petitioner. On cross-examination, Wax testified that he did not present DNA evidence during the trial because he did not feel the State needed it. He acknowledged that according to DNA testing done on semen recovered from the victim, the odds of the semen coming from another African-American unrelated to the petitioner were 1 in 2,400. He also acknowledged that the report concluded the petitioner was a match.

In a written order, the post-conviction court held that the petitioner did not receive the ineffective assistance of counsel. Regarding Catilla Bradley's surprise testimony, the post-conviction court held that the petitioner failed to demonstrate prejudice because the State's theory of the case was that the petitioner entered the victim's apartment via the balcony and, therefore, did not depend on the petitioner's having the keys. As to counsel's failure to challenge James Hill's expert qualifications, the court noted that counsel wanted to cross-examine Hill about unidentified fingerprints found at the crime scene and held that counsel's "treatment of the expert falls within . . . trial strategy." As to counsel's failure to object to Officer Winston's hearsay testimony, the post-conviction court noted that counsel had objected to the testimony and that the petitioner had raised this issue on direct appeal. Furthermore, the post-conviction court noted that counsel testified he did not ask for a curative instruction because he did not want the jury to rehear about the victim's rape allegation and concluded that this was a legitimate trial tactic. Regarding counsel's failure to request a second mental examination for the petitioner or question him about his mental history, the post-conviction court concluded that the petitioner never told counsel he had a mental problem and that counsel had no reason to request another evaluation. Finally, regarding the petitioner's claim that the trial court improperly instructed the jury on the definition of "knowing," the post-conviction court accredited counsel's testimony that the trial court gave the instruction as part of the second degree murder instruction, not first degree murder. The post-conviction court denied the petition for post-conviction relief, and the petitioner appeals.

## II. Analysis

To be successful in a claim for post-conviction relief, the petitioner must prove all factual allegations contained in his post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.2 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, we afford the post-conviction court's findings of fact the weight of a jury verdict, with such findings being conclusive on appeal absent a showing that the evidence in the record preponderates against those findings. Id. at 578.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. Moreover,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697, 104 S. Ct. at 2069).

On appeal, the petitioner first contends that he received the ineffective assistance of counsel because trial counsel failed to investigate his mental health problems, which would have supported a diminished capacity argument. He contends that a diminished capacity claim was warranted in this case because fingerprint evidence placed the petitioner in the victim's apartment around the time of her death and DNA analysis on sperm found in the victim was consistent with the petitioner's DNA profile. However, counsel testified that the petitioner adamantly denied being in the apartment or killing the victim. We note that the petitioner also maintained at the hearing that he was not in the apartment and did not kill the victim. Given the petitioner's denial of any participation in the crime, we agree that counsel had no reason to pursue diminished capacity. Moreover, counsel testified that neither the petitioner nor his family ever indicated the petitioner had mental problems. The petitioner testified that he was taking his medication at the time of the victim's death and was not hearing

voices, and the results of the petitioner's mental evaluation showed he was competent to stand trial. The petitioner has failed to show that counsel rendered deficient performance by failing to request a second evaluation or that he was prejudiced by any deficiency.

Next, the petitioner contends that trial counsel rendered deficient performance while cross-examining Catilla Bradley, resulting in Bradley's surprise testimony that the victim's keys were not in the victim's purse and that the petitioner's father told her the petitioner had taken the keys. He also contends that counsel should have taken curative measures for Bradley's hearsay testimony about what the petitioner's father told her. However, counsel testified that he asked Bradley if the keys were in the purse because he believed Bradley was going to say yes and that he based his belief on the fact that the petitioner's parents were going to testify that the keys were in the purse when they gave it to her. Our review of the trial transcript, which the petitioner has included in the appellate record, confirms that the petitioner's father testified for the petitioner that the victim's keys were in the purse when he gave it to Bradley. Moreover, trial counsel testified that Bradley refused to give a statement before trial. We conclude that the petitioner has failed to show counsel rendered deficient performance while cross-examining Bradley. Furthermore, as the trial court noted, the petitioner's having the victim's keys was not a crucial fact in this case. Therefore, the petitioner also has failed to show that he was prejudiced by Bradley's testimony or counsel's failure to request a curative instruction.

Regarding the petitioner's claim that counsel was ineffective for failing to challenge James Hill's expert qualifications, counsel testified that he wanted Hill to testify in order for counsel to cross-examine him about unidentified prints found on the victim's sliding glass door. As the post-conviction court properly concluded, this was counsel's trial strategy, and this court will not second-guess that strategy. See Irick v. State, 973 S.W.2d 643, 652 (Tenn. Crim. App. 1998).

The petitioner contends that counsel was ineffective for failing to object to Officer Winston's hearsay testimony about what the victim told him on June 30, 1997. Our review of the trial transcript reveals that the State asserted in a jury-out hearing that Officer Winston's testimony was admissible under Tennessee Rule of Evidence 803(2), the excited utterance exception to the hearsay rule. The defense argued that the testimony was inadmissible under Tennessee Rule of Evidence 404(b) and was highly prejudicial, but the trial court ruled the testimony was admissible. On appeal, the petitioner contends that counsel should have argued that the testimony did not fall under the excited utterance exception only because the victim made the damaging statements to Officer Winston twelve hours after the alleged rape. However, the length of time between a startling event and the statement does not automatically preclude the statement's being admissible as an excited utterance. See, e.g., State v. Stout, 46 S.W.3d 689 (Tenn. 2001) (holding that declarant's statements made twelve hours after the event were admissible as excited utterances). Therefore, we conclude that the petitioner has failed to show that counsel rendered deficient performance merely by failing to argue that the statements were too remote in time from the incident to be excited utterances.

As to the petitioner's contention that counsel was ineffective for failing to request a curative instruction when Officer Winston testified that the victim "looked like someone who had been

raped," our review of the trial transcript reveals that counsel immediately objected and that the trial court instructed Officer Winston not to give his opinion. At the evidentiary hearing, counsel testified that he did not request a curative instruction because he did not want the jury to hear about the rape allegation again, which goes to counsel's trial strategy. In any event, the petitioner has failed to demonstrate prejudice.

As his last ineffective assistance of counsel argument, the petitioner contends that counsel "never fully investigated the case [and] never sought any expert testimony to contradict the evidence." We note that the petitioner did not raise this specific argument in his petition for post-conviction relief and that the post-conviction court did not address it in the order denying the petition. In any event, the post-conviction court obviously accredited trial counsel's testimony over that of the petitioner. Counsel testified that he met with the petitioner about ten times before trial, discussed the State's case with him, hired an investigator, visited the crime scene, talked with defense witnesses, and based the theory of defense on the petitioner's adamant claim that he did not kill the victim. The petitioner has failed to show that he received the ineffective assistance of counsel.

Finally, the petitioner contends that the trial court improperly instructed the jury on all three conduct elements when it defined "knowing," citing State v. Page, 81 S.W.3d 781 (Tenn. Crim. App. 2002). Initially, we note that the failure to raise this issue on direct appeal results in a waiver of the issue in a post-conviction proceeding. See Bronzo Gosnell, Jr. v. State, No. E2004-02654-CCA-R3-PC, 2005 Tenn. Crim. App. LEXIS 897, at *14 (Knoxville, Aug. 19, 2005), perm. to appeal denied, (Tenn. 2005). In any event, counsel testified that the trial court defined "knowing" during the jury's charge on the lesser included offense of second degree murder, not first degree murder.[1] Therefore, the jury's first degree murder verdict renders this claim moot. See State v. Paul Graham Manning, No. M2002-00547-CCA-R3-CD, 2003 Tenn. Crim. App. LEXIS 117, at *23 (Nashville, Feb. 14, 2003).

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

_____
NORMA McGEE OGLE, JUDGE

---

[1]The jury instructions on the elements of first degree murder and all lesser included offenses were not transcribed.