IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 11, 2017

**CEDRIC TAYLOR v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 13-00173        J. Robert Carter, Jr., Judge**

_____

**No. W2016-01710-CCA-R3-PC**

_____

The Petitioner, Cedric Taylor, filed a post-conviction petition, seeking relief from his convictions of aggravated robbery, aggravated burglary, and employment of a firearm during the commission of a dangerous felony. In the petition, the Petitioner alleged that his trial counsel was ineffective by calling an alibi witness whose testimony was not favorable to the Petitioner. The post-conviction court denied the petition, and the Petitioner appeals. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Monica A. Timmerman, Bartlett, Tennessee, for the Appellant, Cedric Taylor.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Dru Carpenter, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

On direct appeal, this court summarized the following pertinent facts adduced at the Petitioner's trial:

> [The victim testified that on] June 23, 2012, [she] lived on Longfellow Road in Memphis. That night, a friend picked her up at her home to go dancing at a club called "Eclipse."

Thereafter, the women had dinner at a restaurant, and the victim arrived at her residence between 4:00 and 4:30 a.m. on June 24. As the victim opened the outer black iron door and entered her home, her friend drove away. The victim reached behind her to close the outer door, and she observed two black males, one pointing a gun at her. The male who held the gun pushed her through her open inner door and into her house. She called out to "Mario," one of the individuals with whom she lived at the time, but the male struck her in the head with the gun and instructed her to "shut up." At that point, the second male entered the residence. They "grabbed" the victim, "pushed" her, and then took her handbag. The victim was bleeding from the attack.

After the two males stole the victim's purse, they fled from the residence, and the people with whom she lived entered the room. They called the police and an ambulance, and the victim was later transported to the hospital via ambulance. The victim stated that she required staples in her head as a result of being struck with the gun.

The victim stated that the perpetrator who held the gun and struck her was dressed all in black with white lettering on his shirt. He also had long hair with dreadlocks, a braid in the back of his hair, a goatee, and a beard. She believed him to be between twenty-three and twenty-seven years of age. The other male was also dressed in black and had short hair with a "line" and acne on his face.

A few days later, the victim spoke with Detective Ivan Lopez who showed her a photograph array from which she identified the perpetrator who had wielded the weapon and struck her on the head. She testified at trial that she was "a hundred percent sure that it [was] him[sic]" whom she recognized from the photograph.

. . . .

Detective Lopez with the Memphis Police Department's robbery division testified . . . that on June 26, [the Petitioner] became a suspect in the investigation, which caused him to create a photograph array for the victim to

view. He showed the array to the victim on June 27, and she positively identified [the Petitioner] from the array. Detective Lopez identified [the Petitioner] in court and explained that [the Petitioner] had cut his hair and no longer had dreadlocks.

[The Petitioner] called [his girlfriend,] Tamika Farmer[,] as his first witness, who provided an alibi for [the Petitioner] for the day and time of the robbery. She testified that he was present with her at the home where they resided with [the Petitioner's] cousin[, Andre Jones,] and his cousin's wife[, Josephine Jones]. She stated that they ate dinner, watched movies, and stayed up late talking and "being intimate" and that they did not go to sleep until at least around 5:00 a.m. She was certain of the time because one of the other individuals in the residence had to wake up early for work, which caused Ms. Farmer to check the clock and confirm that it was around 5:00 a.m. Ms. Farmer stated that the next morning they smelled breakfast cooking and went to the kitchen to eat with everyone else. She said that the events were clear in her mind because "that was the last time [she] actually had time to spend with . . . the love of [her] life."

[The Petitioner] then testified in his own defense. He said that on Saturday June 23, he was at home watching television. A family member who was visiting from California[, "Keoke",] came over and brought her three-month-old son. At one point, [the Petitioner] and his cousin walked to the grocery to purchase items for dinner and for breakfast the following morning. He recalled that his cousin and cousin's wife prepared the evening meal, and they "sat around and watched [television]." [The Petitioner] stated that around 8:00 or 9:00 p.m., each couple retired to their respective bedrooms, where [the Petitioner] and Ms. Farmer continued to watch television, talk, and be "intimate" with each other. [The Petitioner] testified that the following morning, [the Petitioner] and Ms. Farmer arose between 7:00 and 8:00 a.m. and joined his cousins in the kitchen to help prepare breakfast. They relaxed and enjoyed the rest of the day together.

. . . .

- 3 -

[The Petitioner] called Josephine Jones, the wife of [the Petitioner's] cousin and one of the people with whom [the Petitioner] and Ms. Farmer lived, as his next witness. Ms. Jones testified that she had the only key to her home at the time [the Petitioner] and Ms. Farmer resided with her and her husband. On cross-examination, Ms. Jones stated that when defense counsel first met with her, she felt "like he was leading [her] to say things." She acknowledged that she was supposed to testify in court that she recalled having a big breakfast with her husband, [the Petitioner], and Ms. Farmer on the morning in question but that she had no recollection of having done so. Furthermore, the cousin who lived in California was not visiting at the time and was not present in their home. Ms. Jones confirmed that the breakfast to which Ms. Farmer and [the Petitioner] testified did not happen. She also said that she did not work on Sundays, so she did not leave the house as Ms. Farmer had stated. Ms. Jones stated that although she possessed the only key to the residence, one did not require a key to leave the house.

. . . .

Following the close of the defense's proof, the jury deliberated and found [the Petitioner] guilty as charged of aggravated robbery, aggravated burglary, and employing a firearm during the commission of a dangerous felony. In a subsequent sentencing hearing, the trial court sentenced [the Petitioner] to nine years for aggravated robbery, five years for aggravated burglary, to be served concurrently with each other, and six years for the firearm conviction to be served consecutively to the five-year sentence, for an effective sentence of eleven years to be served in the Tennessee Department of Correction.

State v. Cedric Taylor, No. W2014-00329-CCA-R3-CD, 2015 WL 127869, at *1-4 (Tenn. Crim. App. at Jackson, Jan. 8, 2015).

Thereafter, the Petitioner filed a timely petition for post-conviction relief, alleging numerous claims of ineffective assistance. Post-conviction counsel was appointed, and no amended petition was filed. However, at the hearing, the post-conviction court

allowed the Petitioner to orally amend his motion[1] to allege that trial counsel was ineffective by calling Ms. Jones as an alibi witness.[2]

At the post-conviction hearing, the Petitioner testified that he was arrested on July 9, 2012; that trial counsel was appointed to represent him; and that trial counsel visited him in jail. The Petitioner told trial counsel that he was innocent of the charges, that he was not at the victim's home at the time of the crimes, and that he was instead at home in bed with his girlfriend, Ms. Farmer. At trial, trial counsel called Ms. Farmer and Ms. Jones as alibi witnesses.

The Petitioner said that between the time of the crimes and his trial, his cousin, Mr. Jones, was murdered by Ms. Jones's son. The Petitioner repeatedly told trial counsel that he did not think Ms. Jones's testimony would be helpful to his defense, explaining that he thought she would "do anything by any means necessary to get her son out of trouble[.]" Nevertheless, trial counsel insisted that Ms. Jones should testify because she was at her residence when the Petitioner claimed to be there. The Petitioner said that when Ms. Jones testified at trial, she contradicted the alibi established by the Petitioner's and Ms. Farmer's testimony and had trouble remembering what happened on the night of the crimes. The Petitioner thought Ms. Jones's testimony negatively affected the outcome of the trial.

On cross-examination, the Petitioner said that he provided trial counsel with the names of alibi witnesses and that trial counsel found some, but "not all," of them. The Petitioner said that he did not want Ms. Jones to testify because he thought she would lie because her husband had been murdered.

Upon questioning by the post-conviction court, the Petitioner said that he and Ms. Farmer testified that he was at home with her at the time of the crimes. The court asked what the jury would think if the Petitioner and Ms. Farmer testified they were at Ms. Jones's house, but Ms. Jones did not testify, and the Petitioner responded, "The truth." The Petitioner acknowledged that trial counsel advised him that if he were putting on an alibi defense, he needed to call the people who were present at the place where he claimed to be at the time. However, the Petitioner claimed that Ms. Jones's testimony was "conflicted when she can have a vendetta or anything just to try and get her son off the murder charge[.]" The post-conviction court asked the Petitioner to explain how Ms. Jones's testimony at the Petitioner's trial would help her son. At that point, the following colloquy occurred:

_____

[1]See Tenn. Sup. Ct. R. 28, § 8(D)(5).

[2]The Petitioner has abandoned the remainder of his issues on appeal. Accordingly, we have chosen to limit our recitation of the facts to those pertinent to the Petitioner's issue.

[The Petitioner:] . . . I'm saying I didn't want her to be my alibi witness because of that situation. And she just want – she wasn't credible because she – then she stated that she was hit in the head during this incident with my cousin and her son which led her – she had memory loss. So if she had memory loss, how could she say these things did not happen? If we didn't have the breakfast and I wasn't – and she – and I didn't go to work with her when she explained to my lawyer when my lawyer did talk to her in the beginning of the case that she remembered all of that and then get to the trial and then say she can't remember. And I just knew that she was going to probably do that because she wanted some help.

[The post-conviction court:] That's what I'm curious about. How did you know she was going to do that? You're telling me you brought this all out in advance and told [trial counsel] don't call Ms. Jones because you think she might testify different than what she's already told you and told [trial counsel]?

[The Petitioner:] It was a conflict because of the situation that was going on within the family, with the murder of my cousin and which is her husband, and it just was conflict of interest.

Trial counsel testified that he worked in the Shelby County Public Defender's Office and that he had been practicing law for seven or eight years when he was appointed to represent the Petitioner. Trial counsel met with the Petitioner "many times," and he thought the Petitioner was innocent. The Petitioner suggested that Ms. Farmer and Mr. and Ms. Jones could be alibi witnesses.

Trial counsel said that the defense's investigator, Al Gray, took a statement from Ms. Jones in which she was "forthcoming and corroborat[ed] everything that [the Petitioner] and [Ms. Farmer] had told us about what happened, the living conditions and the situation and the key and not having access and being able to exit at times." Trial counsel spoke with his co-counsel and some other people in his office, and he decided to subpoena Ms. Jones in order to get her to testify "about whether there could have been access without her being involved and whether [the Petitioner] lived there and the situation that morning was he at home that morning." When trial counsel spoke with Ms. Jones "outside of court" immediately prior to trial, she reiterated the information contained in her statement. However, during her testimony, "she scuttled the case" and

was "a very difficult witness," often responding that she did not know or could not remember what happened. Trial counsel and co-counsel "made a decision based on her issues and her difficulty that the jury would likely discard [her testimony] and see it as a tactic by her for what reason I don't know, to, you know, to do whatever." Trial counsel acknowledged that he and the Petitioner discussed the Petitioner's desire not to call Ms. Jones, noting that they discussed all of the witnesses. Trial counsel asserted, "I made a decision during the trial to call her as a witness, just to corroborate [Ms. Farmer's] and [the Petitioner's] statement that they didn't have a key and they couldn't come and go as they pleased"; however, at trial Ms. Jones "was hesitant to confirm that."

Trial counsel said that he was aware that Mr. Jones had been murdered prior to trial. Nevertheless, he noted that Ms. Jones "was a religious woman" and that she "swore to tell the truth." Trial counsel said that he did not ask Ms. Jones many questions, only "whether [the Petitioner and Ms. Farmer] had a key, whether they had breakfast that morning, and she was just reluctant to even – I mean, to even go into that area." Trial counsel said that he was surprised when Ms. Jones testified that she "felt as if she was being led by [him]," noting that he only wanted her to reiterate the information in the statement she had given.

On cross-examination, trial counsel said that his co-counsel had over twenty years of experience with the public defender's office. He noted that both he and co-counsel spoke with Ms. Jones prior to trial and that they decided it would be in the Petitioner's best interest if she testified. Trial counsel said that "from a tactical perspective," he thought he could focus her testimony on whether the Petitioner had a key to the house. He and co-counsel discussed the issue with each other, with their immediate supervisor, and with the public defender's "appellate attorney." Trial counsel said that the Petitioner and his mother cautioned that "[w]e may have an issue with [Ms. Jones]," but trial counsel saw nothing definitive that concerned him, and he knew that Ms. Jones's statement corroborated the Petitioner's and Ms. Farmer's version of events. Trial counsel said that when Ms. Jones testified, "it was like a new person." Trial counsel was "shocked" and asked the trial court for permission to treat Ms. Jones as a hostile witness. Although he asked her direct questions, she was "nonchalant" and "avoiding."

Trial counsel said that he met with the Petitioner on numerous occasions, that he prepared the Petitioner to testify, and that he kept the Petitioner advised of the developments in the case.

Upon questioning by the post-conviction court, trial counsel said that the defense investigator informed him that "Ms. Jones's sons were arrested for the homicide related to [the Petitioner's] cousin."

At the conclusion of the hearing, the post-conviction court held that the Petitioner had failed to establish that trial counsel was ineffective. On appeal, the Petitioner challenges this ruling.

## II. Analysis

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Moreover,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner]

makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

On appeal, the Petitioner maintains that the post-conviction court erred by finding that trial counsel was not ineffective by calling Ms. Jones as an alibi witness at trial. The Petitioner contends that he warned trial counsel that Ms. Jones's testimony "would be adverse to the defense" and that her testimony ultimately prejudiced the outcome of the trial. The State responds that trial counsel made "an informed and strategic decision to call [Ms.] Jones as a witness" and that he could not have reasonably anticipated that her testimony would deviate from the information given in her statement. The State contends, therefore, that the trial court correctly concluded that the Petitioner failed to prove that trial counsel was ineffective. We agree with the State.

The post-conviction court found that trial counsel decided that if he did not call Ms. Jones as a witness, the jury would question the credibility of the Petitioner's alibi defense. Moreover, although the Petitioner warned trial counsel that Ms. Jones might not be a favorable witness, a defense investigator interviewed Ms. Jones, and she gave a statement that corroborated the Petitioner's and Ms. Farmer's version of events. Further, when trial counsel spoke with Ms. Jones immediately prior to trial, she appeared willing to testify in conformity with her statement. Accordingly, trial counsel was "surprised" by Ms. Jones's testimony. The post-conviction court held that trial counsel made a reasonable, tactical decision to call Ms. Jones as a witness and that the "jury resolved the conflicts in the testimony in favor of the [S]tate." We agree. This court has stated that, "[w]hen reviewing trial counsel's actions, this court should not use the benefit of hindsight to second-guess trial strategy and criticize counsel's tactics." Irick v. State, 973 S.W.2d 643, 652 (Tenn. Crim. App. 1998). On appeal, this court may not second-guess the tactical or strategic choices of counsel unless those choices are based upon inadequate preparation, nor may we measure counsel's behavior by "20-20 hindsight." See State v. Hellard, 629 S.W.2d 4, 9 (Tenn. 1982). Moreover, "[a]llegations of ineffective assistance of counsel relating to matters of trial strategy or tactics do not provide a basis for post-conviction relief." Taylor v. State, 814 S.W.2d 374, 378 (Tenn. Crim. App. 1991). The post-conviction court did not err when it held that the Petitioner failed to establish that trial counsel was ineffective.

### III. Conclusion

The judgment of the post-conviction court is affirmed.

_____
NORMA MCGEE OGLE, JUDGE